*PRELIMINARY PRINT*

VOLUME 606 U. S. PART 1
PAGES 46–99

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 20, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## STANLEY *v.* CITY OF SANFORD, FLORIDA

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 23–997.   Argued January 13, 2025—Decided June 20, 2025

Karyn Stanley worked as a firefighter for the City of Sanford, Florida, starting in 1999.   When Ms. Stanley was hired, the City offered health insurance until age 65 for two categories of retirees: those with 25 years of service and those who retired earlier due to disability.   In 2003, the City changed its policy to provide health insurance up to age 65 only for retirees with 25 years of service, while those who retired earlier due to disability would receive just 24 months of coverage.   Ms. Stanley later developed a disability that forced her to retire in 2018, entitling her to only 24 months of health insurance under the revised policy.

  Ms. Stanley sued, claiming the City violated the Americans with Disabilities Act by providing different health-insurance benefits to those who retire with 25 years of service and those who retire due to disability. The district court dismissed her ADA claim, reasoning that the alleged discrimination occurred after she retired, when she was not a "qualified individual" under Title I of the ADA, 42 U. S. C. § 12112(a), because she no longer held or sought a job with the defendant.   The Eleventh Circuit affirmed.

*Held*: The judgment is affirmed.

83 F. 4th 1333, affirmed.

  JUSTICE GORSUCH delivered the opinion of the Court with respect to Parts I and II, concluding that, to prevail under § 12112(a), a plaintiff must plead and prove that she held or desired a job, and could perform its essential functions with or without reasonable accommodation, at the time of an employer's alleged act of disability-based discrimination. Pp. 51–59.

  (a) Section 12112(a) makes it unlawful for a covered employer to discriminate against a qualified individual on the basis of disability in regard to compensation.   The parties agree that retirement benefits qualify as "compensation" and assume the City's policy revision constituted disability-based discrimination.   The disagreement centers on whether § 12112(a) addresses discrimination against retirees.

  A "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires."   § 12111(8).   Congress's use of present-tense verbs ("holds," "desires," "can perform") signals that

§ 12112(a) protects individuals able to do the job they hold or seek at the time they suffer discrimination, not retirees who neither hold nor desire a job.

The statute's definition of "reasonable accommodation"—"job restructuring," modifying "existing facilities used by employees," and altering "training materials or policies," § 12111(9)—makes sense for current employees or applicants but not for retirees.  Section 12112(b)'s examples of discrimination, such as "qualification standards" and "employment tests," similarly aim to protect job holders and seekers, not retirees.

Comparing Title I of the ADA and Title VII of the Civil Rights Act of 1964 reinforces this reading.  Title VII protects "employee[s]," § 2000e(f), without temporal qualification, sometimes covering former employees.  But where Title VII links "employee" to present-tense verbs, it refers to current employees.  *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341, n. 2, 343.  Similarly the ADA's "qualified individual" yoked to present-tense verbs suggests current job holders or seekers.

Court precedent supports this interpretation.  In *Cleveland* v. *Policy Management Systems Corporation*, the Court noted that a plaintiff's assertion she is "'unable to work' will appear to negate an essential element of her ADA case," anticipating that someone may fall outside § 12112(a)'s protections if she can "no longer do the job."  526 U. S. 795, 799, 806.  Pp. 51–55.

(b) Ms. Stanley argues that § 12112(a)'s "qualified individual" requirement is a conditional mandate—applicable only if a plaintiff holds or seeks a job.  If neither, she contends, there are no "essential functions" to perform, making every retiree automatically "qualified."  The Court rejects this conceivable-but-convoluted interpretation in favor of the ordinary one.

Ms. Stanley's surplusage argument—that the Court's reading renders § 12112(b)(5)(A)'s reference to "applicant or employee" meaningless—also fails.  That phrase may still serve a narrowing function, and "[t]he canon against surplusage is not an absolute rule."  *Marx* v. *General Revenue Corp.*, 568 U. S. 371, 385.

Ms. Stanley argues that Title I's broad language allowing "any person alleging discrimination" to sue makes the "qualified individual" language irrelevant.  But the statute protects people, not benefits, from discrimination—specifically, qualified individuals.

Finally, Ms. Stanley invokes the ADA's purpose of eradicating disability-based discrimination.  She argues this goal would be best served by a judicial decision extending Title I's protections to retirees.  But "legislation [does not] pursu[e] its purposes at all costs," *Rodriguez* v. *United States*, 480 U. S. 522, 525–526, and other laws may protect

Syllabus

retirees from discrimination. If Congress wishes to extend Title I to retirees, it can do so. Pp. 55–59.

GORSUCH, J., delivered the opinion of the Court with respect to Parts I and II, in which ROBERTS, C. J., and THOMAS, ALITO, KAGAN, KAVANAUGH, and BARRETT, JJ., joined, and an opinion with respect to Part III, in which ALITO, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which BARRETT, J., joined, *post*, p. 66. SOTOMAYOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 74. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined as to Parts III and IV, except for n. 12, *post*, p. 75.

*Deepak Gupta* argued the cause for petitioner. With him on the briefs were *Eric F. Citron*, *Robert Friedman*, *Jennifer D. Bennett*, *Jessica Garland*, and *Patricia R. Sigman*.

*Frederick Liu* argued the cause for the United States as *amicus curiae* urging vacatur. With him on the brief were *Solicitor General Prelogar*, *Assistant Attorney General Clarke*, *Deputy Solicitor General Fletcher*, *Tovah R. Calderon*, *Sydney A. R. Foster*, *Karla Gilbride*, *Jennifer S. Goldstein*, *Anne Noel Occhialino*, and *James M. Tucker*.

*Jessica C. Conner* argued the cause for respondent. With her on the brief were *Douglas T. Noah* and *Patricia M. Rego Chapman*.*

———————

*Briefs of *amici curiae* urging reversal were filed for AARP et al. by *Louis Lopez*, *William Alvarado Rivera*, and *Rebecca Rodgers*; for the American Federation of Labor and Congress of Industrial Organizations by *Harold C. Becker* and *Matthew Ginsburg*; for the Constitutional Accountability Center by *Elizabeth B. Wydra* and *Brianne J. Gorod*; for the Disability Rights Legal Center et al. by *J. Carl Cecere*; for the Georgia Advocacy Office et al. by *Paul Koster*; for the International Association of Fire Fighters by *John R. Mooney*; and for Main Street Alliance by *Bradley Girard*, *Rachel L. Fried*, *Robin F. Thurston*, and *Sunu Chandy*.

Briefs of *amici curiae* urging affirmance were filed for the Center for Workplace Compliance by *Michael J. Eastman*; for the Chamber of Commerce of the United States of America by *Michael E. Kenneally* and *James D. Nelson*; and for the Local Government Legal Center et al. by *Meaghan VerGow*, *Amanda Karras*, and *Erich Eiselt*.

JUSTICE GORSUCH announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, and an opinion with respect to Part III, in which JUSTICE ALITO, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join.

Title I of the Americans with Disabilities Act bars employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . compensation" and other matters. 42 U. S. C. § 12112(a). The statute defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). The question before us concerns whether a retired employee who does not hold or seek a job is a "qualified individual."

I

Because this case comes to us on a motion to dismiss, we take as true the well-pleaded facts in the plaintiff's complaint, *National Rifle Association of America* v. *Vullo*, 602 U. S. 175, 181 (2024), and do not consider evidence beyond that pleading, Fed. Rule Civ. Proc. 12(d); *Carter* v. *Stanton*, 405 U. S. 669, 671 (1972) (*per curiam*). With those constraints in mind, we begin by setting out the facts as the plaintiff, Karyn Stanley, has alleged them.

Ms. Stanley started working as a firefighter for the city of Sanford, Florida (City), in 1999. At first, she planned to serve for 25 years. Complaint in No. 6:20–cv–00629 (MD Fla.), ECF Doc. 1, ¶¶ 13, 16 (Complaint). Part of the reason for that had to do with health insurance. At the time the City hired her, it offered health insurance until age 65 for two categories of retirees: those who retired with 25 years of service, and those who retired earlier because of a disability. *Id.*, ¶ 19. In 2003, though, the City changed its policy. Going forward, it said, it would continue to pay for health insurance up to age 65 for retirees with 25 years of service. *Id.*, ¶¶ 20–21. But for those who retired earlier due to dis-

ability, the City announced, it would now provide health insurance for just 24 months, unless the retiree started receiving Medicare benefits sooner. *Id.*, ¶ 20. At some point after the City revised its policy, Ms. Stanley's complaint does not say when, she began to suffer from an unspecified disability. *Id.*, ¶ 16. And, in 2018, that "disability forced her to retire" earlier than she had planned. *Ibid.* Under the City's revised policy, that meant she was entitled to at most 24 months of health insurance.

Based on these facts, Ms. Stanley brought suit claiming that the City had violated the ADA and a number of other state and federal laws. Providing different health-insurance benefits to those who retire with 25 years of service and those who retire earlier due to disability, she contended, amounted to impermissible discrimination based on disability. The City responded by filing a motion to dismiss Ms. Stanley's complaint for failure to state a claim.

The district court denied that motion in part, allowing some of Ms. Stanley's claims to proceed. But with respect to her ADA claim, the district court saw things differently. Ms. Stanley's complaint, the court observed, alleged that the City had treated her worse than other similarly situated individuals because of her disability, App. to Pet. for Cert. 21a–22a, what is known as a disparate-treatment claim, see *Raytheon Co.* v. *Hernandez*, 540 U. S. 44, 53 (2003). To state such a claim under the ADA, the court continued, § 12112(a) required her to allege, among other things, facts sufficient to show that she was a "qualified individual" at the time of the City's alleged discrimination. App. to Pet. for Cert. 24a. But in this case, the court reasoned, the discrimination Ms. Stanley alleged—reduced healthcare benefits—did not take place until after she retired. And by that point, she was not a "qualified individual" under the ADA because she was not someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8); see App. to Pet. for Cert. 26a. As a result, the court held, it

had no choice but to grant the City's motion to dismiss her ADA claim. *Id.*, at 26a.

The Eleventh Circuit affirmed. It, too, concluded that § 12112(a) does not reach allegations of discrimination against a retiree "who does not hold or desire to hold an employment position" that she is capable of performing with reasonable accommodation. 83 F. 4th 1333, 1337 (2023). But, the court acknowledged, not every court of appeals would agree. Like the Eleventh Circuit, the Sixth, Seventh, and Ninth Circuits have said that Title I's antidiscrimination provision "does not protect people who neither held nor desired a job with the defendant at the time of discrimination." *Id.*, at 1341. But the Second and Third Circuits take a different view. As those courts see it, the ADA's definition of "qualified individual" is "ambiguous," and they have resolved that ambiguity "in favor of" extending the statute to reach retirees like Ms. Stanley. *Ibid.*

We granted certiorari to resolve the circuits' disagreement over whether § 12112(a) reaches discrimination against retirees who neither hold nor desire a job whose essential tasks they can perform with reasonable accommodation. 602 U. S. 1038 (2024).

II

A

The ADA contains five titles separately addressing employment, public entities, public accommodations, telecommunications, and miscellaneous matters. 104 Stat. 327–328. Ms. Stanley brought her suit under Title I, which speaks to employment. Section 12112(a) provides Title I's general liability rule for disability discrimination. It makes it unlawful for a covered employer to "discriminate against a qualified individual on the basis of disability in regard to . . . compensation," among other things.

The parties disagree about the meaning of this language, but their dispute is a narrow one. They take as given that retirement benefits, like those at issue here, qualify as "com-

pensation."   See *Hishon* v. *King & Spalding*, 467 U. S. 69, 77 (1984); *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 682 (1983).   For purposes of our review, we may also assume that the City's revision to its retirement-benefits plan constituted "discrimina[tion] . . . on the basis of disability."   The only question that separates the parties is whether § 12112(a) addresses discrimination against retirees like Ms. Stanley.   She (and two circuits) think the answer is yes; the City (and several other circuits) believe otherwise.

To resolve that disagreement, we turn, as we must, to the statutory terms Congress has given us.   Section 12112(a) tells us that Title I prohibits discrimination against "qualified individual[s]."   And a qualified individual, Title I continues, is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires."   § 12111(8).   From these directions, one clue emerges immediately. "[T]o ascertain a statute's temporal reach," this Court has "frequently looked to Congress' choice of verb tense."   *Carr* v. *United States*, 560 U. S. 438, 448 (2010).   And here, Congress has made it unlawful to "*discriminate* against" someone who "*can perform* the essential functions of" the job she "*holds* or *desires.*"   Those present-tense verbs signal that § 12112(a) protects individuals who, with or without reasonable accommodation, are able to do the job they hold or seek at the time they suffer discrimination.   Conversely, those verbs tend to suggest that the statute does not reach retirees who neither hold nor desire a job at the time of an alleged act of discrimination.

Reinforcing this assessment is the statute's definition of "reasonable accommodation."   Title I, recall, prohibits discrimination against an individual who can perform essential job functions "with or without reasonable accommodation." § 12111(8); see § 12112(a).   And a "reasonable accommodation," the ADA provides, refers to things like "job restruc-

turing," modifying "existing facilities used by employees," and altering "training materials or policies." § 12111(9). Those kinds of accommodations make perfect sense when it comes to current employees or applicants. But it is hard to see how they might apply to retirees who do not hold or seek a job.

Section 12112(b) conveys a similar message. That provision offers examples of what constitutes "'discriminat[ion] against a qualified individual on the basis of disability.'" So, for instance, subsection (b)(6) defines discrimination to include using certain "qualification standards, employment tests or other selection criteria" unless they are "job-related for the position in question." Plainly, that mandate aims to protect jobseekers. But it makes no sense in the context of retirees who do not seek employment. The same goes for subsection (b)(7), which requires that "tests concerning employment . . . accurately reflect the skills" and "aptitude" of an "employee or applicant." It would be strange for employers to test the job skills of former employees who do not plan to return to work. This pattern repeats itself throughout § 12112(b), underscoring § 12112(a)'s focus on current and prospective employees—not retirees.

Instructive, too, is the fact that another part of the statute speaks differently. Where § 12112(a) prohibits certain acts of employment discrimination against "a qualified individual," § 12203(a) prohibits retaliation against "any individual" who opposes a discriminatory act. That Congress used different language in these two provisions strongly suggests that it meant for them to work differently. After all, when a document uses a term in one place and a materially different term in another, "'the presumption is that the different term denotes a different idea.'" *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450, 458 (2022) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012)).

Further evidence still comes from examining Title I of the ADA in light of Title VII of the Civil Rights Act of 1964, 78

Stat. 253, as amended, 42 U. S. C. §2000e *et seq.* The two statutes share much in common, not least the fact that they both address employment discrimination. See *Mount Lemmon Fire Dist.* v. *Guido*, 586 U. S. 1, 4, n. 1 (2018). But the statutes also bear differences we have found illuminating in the past. See, *e. g.*, *EEOC* v. *Abercrombie & Fitch Stores, Inc.*, 575 U. S. 768, 773 (2015). And one difference concerns the class of people the statutes protect. Title VII protects "employees," §2000e–3(a), a term that law defines without "any temporal qualifier," *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 342 (1997). In keeping with that unqualified term, Title VII sometimes bars discrimination against former employees as well as current ones. *Id.*, at 341. But elsewhere in Title VII, context clarifies that "the term 'employee' refers unambiguously to a current employee." *Id.*, at 343. That is true, for instance, where the statute links the term "employee" to present-tense verbs like *work* and *has*. *Id.*, at 341, n. 2, 343. The upshot? Even if the ADA's reference to a "qualified individual," like Title VII's reference to an "employee," might be read in isolation to encompass retirees, once Congress yokes those kinds of terms to present-tense verbs—such "holds," "desires," and "can perform"—that assumption becomes considerably less plausible.

Beyond all this textual evidence lies our precedent. Construing an earlier version of Title I in *Cleveland* v. *Policy Management Systems Corp.*, this Court explained that "[a]n ADA plaintiff bears the burden of proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." 526 U. S. 795, 806 (1999) (quoting 42 U. S. C. §12111(8)). Accordingly, the Court concluded, "a plaintiff's sworn assertion" that she is "'unable to work' will appear to negate an essential element of her ADA case." 526 U. S., at 806. In saying as much, the Court anticipated the possibility that someone may fall outside the protections of §12112(a) if she can "'no longer do the job.'"

*Id.*, at 799; accord, *Albertson's, Inc.* v. *Kirkingburg*, 527 U. S. 555, 567 (1999).[1]

B

Against this evidence of statutory meaning, Ms. Stanley and the dissent offer several replies. They begin by suggesting that we should interpret §12112(a)'s "qualified individual" requirement as imposing only a "conditional mandate." Brief for Petitioner 28; *post*, at 87–88 (opinion of JACKSON, J.). As Ms. Stanley and the dissent see it, if a plaintiff claims discrimination with respect to a job she seeks or holds, then she must show that she is able to perform that job's essential functions. Brief for Petitioner 28. But if the plaintiff neither holds nor desires a job, the argument goes, then she must make no such showing. In that case, the plaintiff is necessarily a "qualified individual," because it is impossible for someone to be unqualified for a nonexistent position. *Id.*, at 40. Through this series of steps, we are asked to conclude, every retiree is a "qualified individual."

As easy as it may be to imagine a statute like the one Ms. Stanley and the dissent outline, it bears scant resemblance to the one Congress enacted. Title I might have said, for example, that a qualified individual is one who "can perform the essential functions of the employment position, *if any*, that such individual holds or desires." See Brief for Chamber of Commerce of the United States of America as *Amicus Curiae* 9. But nothing like that italicized language appears in §12112(a). And even supposing Ms. Stanley's conditional-mandate theory were a textually permissible way to understand the statute, we do not usually pick a conceivable-but-

---

[1] After *Cleveland*, Congress amended the ADA so that it no longer requires a plaintiff to show that she was a qualified individual "'*with a disability*'" at the time of the defendant's discrimination. ADA Amendments Act of 2008, 122 Stat. 3557 (emphasis added). But this change in statutory directions does nothing to call into question *Cleveland*'s insight that a plaintiff must plead and prove that she was a "qualified individual" when the defendant's discrimination took place.

convoluted interpretation over the ordinary one. *Wisconsin Central Ltd.* v. *United States*, 585 U. S. 274, 277 (2018); cf. Tr. of Oral Arg. 15 (Ms. Stanley acknowledging that her reading may "not [be] the most intuitive" one).

Separately, Ms. Stanley attempts a surplusage argument. Brief for Petitioner 32–33, 46. She contends that our interpretation of "qualified individual" would render meaningless part of §12112(b)(5)(A), which defines discrimination to include the failure to reasonably accommodate "an otherwise *qualified individual* with a disability *who is an applicant or employee*." (Emphasis added.) After all, Ms. Stanley suggests, if every "qualified individual" holds or desires a job, then §12112(b)(5)(A)'s reference to "applicant or employee" performs no real work. To avoid that outcome, she submits, the class of qualified individuals must include retirees.

Difficulties attend this argument as well. To start, our reading of "qualified individual" may still leave work for "applicant or employee" to perform in §12112(b)(5)(A). It might be, for example, that the phrase "applicant or employee" narrows the provision, so that it does not refer to a "nonapplicant" who desires but does not apply for a job. Cf. *Davoll* v. *Webb*, 194 F. 3d 1116, 1132 (CA10 1999); *Daugherty* v. *El Paso*, 56 F. 3d 695, 699 (CA5 1995). But even if the phrase "applicant or employee" is redundant, serving only to underscore that §12112(b)(5)(A) extends beyond existing employees to those seeking work, "[t]he canon against surplusage is not an absolute rule." *Marx* v. *General Revenue Corp.*, 568 U. S. 371, 385 (2013). And it certainly does not require us to favor "an unusual meaning that will avoid surplusage" over a more natural one. Scalia & Garner, Reading Law, at 176.

Perhaps sensing that Title I's definition of "qualified individual" goes against them, Ms. Stanley and the dissent next effectively ask us to strike it from the statute. As they point out, Title I allows "any person alleging discrimination

on the basis of disability" to sue.   § 12117(a).   And a plaintiff
may file that suit whenever she "is affected by" discrimina-
tion.   § 2000e–5(e)(3)(A).   Finally, such suits can challenge
discriminatory "compensation."   § 12112(a); see Brief for
Petitioner 21.   Putting this all together, Ms. Stanley and the
dissent reason, this case checks all the boxes:   Ms. Stanley
is a "person" suing about discriminatory "compensation" that
"affected" her during retirement.   And that is all Title I re-
quires—making "the 'qualified individual' language . . .
largely beside the point."   *Id.*, at 21; see *post*, at 95–96 (opin-
ion of JACKSON, J.).

   This argument misapprehends the nature of Title I's pro-
tections.   It may be that "retirement benefits are 'compen-
sation' protected by the Act."   Brief for Petitioner 21.   No
one before us disputes that point.   But § 12112(a) does not
protect "compensation" as such.   Instead, it bars employers
from "discriminat[ing] *against a qualified individual* on the
basis of disability in regard to . . . compensation."   (Empha-
sis added.)   In other words, the statute protects people, not
benefits, from discrimination.   And the statute also tells us
who those people are:   qualified individuals, those who hold
or seek a job at the time of the defendant's alleged discrimi-
nation.   § 12111(8).   So rather than resolve anything, this
argument takes us right back to where we started.[2]

   Failing all else, Ms. Stanley and the dissent ask us to look
beyond text and precedent.   Brief for Petitioner 29, 47; *post*,
at 92–93 (opinion of JACKSON, J.).   Finding "pure textualism"
insufficiently pliable to secure the result they seek, they in-
voke the statute's "primary purpose" and "legislative his-

——————

   [2] Seeking to downplay § 12111(8)'s definition of "qualified individual" in
yet another way, the dissent suggests it does not "make any *sense*" to
think Congress used that "provision to moonlight as . . . a temporal re-
striction" on antidiscrimination protections.   *Post*, at 90–91 (opinion of
JACKSON, J.).   But § 12111(8)'s express terms can hardly be so casually
dismissed.   Their day job is to work together with § 12112(a) to define the
reach of Title I's protections.

tory." *Post*, at 75, 89–90, 96. As they see it, the ADA's goal of eradicating disability-based discrimination would be best served by a decision extending Title I's protections beyond those who hold or seek a job to retirees.

But this submission falters, too. For one thing, and as this Court has "emphasized many times," what Congress (possibly) expected matters much less than what it (certainly) enacted. *Patel* v. *Garland*, 596 U. S. 328, 346 (2022). Nobody disputes the ADA's stated ambition to root out "discrimination against individuals with disabilities." § 12101(b)(1). But it is "quite mistaken to assume . . . that any interpretation of a law that does more to advance a statute's putative goal must be the law." *Luna Perez* v. *Sturgis Public Schools*, 598 U. S. 142, 150 (2023) (internal quotation marks omitted). "Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known pursues its stated purpose at all costs." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 89 (2017) (internal quotation marks and brackets omitted). Accordingly, this Court has long recognized that the "textual limitations upon a law's scope" must be understood as "no less a part of its purpose than its substantive authorizations." *Kucana* v. *Holder*, 558 U. S. 233, 252 (2010) (internal quotation marks omitted).

For another, we cannot say Title I's textual limitations necessarily clash with the ADA's broader purposes. One court of appeals, for example, has predicted that judicial innovations extending § 12112(a)'s protections to retirees might "create perverse incentives" by encouraging employers to reduce retirement healthcare benefits for people with disabilities. *Morgan* v. *Joint Admin. Bd., Retirement Plan of Pillsbury Co. and AFL-CIO-CLC*, 268 F. 3d 456, 458 (CA7 2001). See how that dynamic might play out in this case. The 24-month health-insurance benefit at issue here bridges the typical gap between disability retirement and the start of Medicare eligibility. Brief for Respondent 7 (citing 42 U. S. C. § 426(b)(2)(A)); see *Becerra* v. *Empire Health Foun-*

*dation, for Valley Hospital Medical Center*, 597 U. S. 424,
428 (2022). Responding to a decision holding that § 12112(a)
addresses discrimination against retirees, the City might
simply delete any reference to disability from its retirement
policy to ensure that it contains no "disability-based distinc-
tion." Complaint ¶30. The result? Anyone who served
25 years would get subsidized health insurance. Everyone
else, regardless of disability, would get nothing. Cf. App.
42–44.

Whether adopting Ms. Stanley's and the dissent's view of
the statute would encourage outcomes like that is anyone's
guess. But the possibility underscores why Congress's deci-
sion to limit the scope of Title I's antidiscrimination provi-
sion is not necessarily at war with the ADA's broader aims.
Nor, of course, do the law's present limitations preclude fu-
ture legislation from going further. If Congress wishes to
extend Title I to reach retirees like Ms. Stanley, it can. But
the decision whether to do so lies with that body, not this
one. See, *e. g.*, *National Pork Producers Council* v. *Ross*,
598 U. S. 356, 382 (2023) (opinion of GORSUCH, J.).

For another thing yet, other avenues may exist for retirees
like Ms. Stanley to seek relief. As her own complaint sug-
gests (but the dissent neglects), a variety of other laws be-
sides Title I of the ADA may protect retirees from discrimi-
nation with respect to postemployment benefits. Complaint
¶1 (alleging claims under state law and the Rehabilitation
Act, and an equal protection claim under Rev. Stat. § 1979,
42 U. S. C. § 1983); see also Brief for Local Government Legal
Center et al. as *Amici Curiae* 13–14 (discussing state-law
remedies); *Weyer* v. *Twentieth Century Fox Film Corp.*, 198
F. 3d 1104, 1112 (CA9 2000) (discussing other potential reme-
dies). As we discuss below, too, even Title I, with its "quali-
fied individual" limitation, may reach many claims involving
discrimination with respect to retirement benefits.[3]

---

[3] In a final line of attack, the dissent criticizes us for "reach[ing] out" to
decide whether the ADA addresses discrimination against retirees who
neither hold nor desire a job. *Post*, at 98–99 (opinion of JACKSON, J.). But

## III

We took this case to resolve a circuit split over whether a retired employee who does not hold or seek a job is a "qualified individual" under Title I.  In her merits briefing, Ms. Stanley invites us to address not just that question but another one, too.  Even if § 12112(a) protects only those who hold or seek a job when a challenged act of discrimination occurs, she says, we should decide whether her complaint satisfies that standard.  The government, as *amicus*, joins in this request.  See Brief for United States as *Amicus Curiae* 26–28.  Ordinarily, of course, this Court rejects attempts to inject "an entirely new question at the merits stage."  *Post*, at 71 (THOMAS, J., concurring in part and concurring in judgment).  But we find it profitable to make an exception in this case, for while taking up Ms. Stanley's additional question reveals some problems with her pleading, it also highlights how Title I might provide relief for retirees like her.*

In addressing this additional question, we take as given the Court's holding above that a plaintiff pursuing a claim under § 12112(a) must plead and prove that she held or

---

here is the truth of it.  *Ms. Stanley* petitioned this Court for certiorari, asking us to resolve a "long-running" circuit split concerning whether an individual who "no longer holds or seeks to hold" a job may sue under the Title I "for discrimination that harms her post-employment."  Pet. for Cert. 15.  After we granted her petition, Ms. Stanley renewed her argument that she had suffered actionable postemployment discrimination.  Brief for Petitioner 24, 47.  The City disagreed.  Brief for Respondent 27–36.  There is nothing remarkable about this Court resolving that dispute and the question presented.  To be sure, after we granted review, Ms. Stanley's merits briefs sought to inject an additional issue into the case, now arguing that she *also* suffered discrimination "while she was still employed."  *Post*, at 66 (THOMAS, J., concurring in part and concurring in judgment).  But to suggest that the case before us does not involve a postemployment discrimination, and that the Court "reaches out" to issue an "'advisory opinio[n]'" on the subject, ignores both why we took this case and the arguments of the parties before us.  *Post*, at 76, 84, 98–99 (opinion of JACKSON, J.).

sought a job when the defendant discriminated against her
on the basis of disability.   We take as given, too, that unlaw-
ful discrimination can take place at any one of three points
in time:   When a defendant "adopt[s]" a "discriminatory . . .
practice," when an individual "is affected by application of a
discriminatory . . . practice," or when she "becomes subject
to" such a practice.   §2000e–5(e)(3)(A).   With all that in
mind, we turn to consider whether Ms. Stanley's pleading
states a claim.

   Start with the first option.   Unlawful discrimination oc-
curs "when a discriminatory compensation decision or other
practice is adopted."   §2000e–5(e)(3)(A).   Here, Ms. Stanley
alleges that happened in 2003, when the City revised its
health-insurance policy for employees who retire because of
disability.   Complaint ¶¶ 20–21.   At that point, her allega-
tions show, she was a "qualified individual," working as a
firefighter and able to perform the job's essential functions.
See *id.*, ¶¶ 13–15.

   The trouble for Ms. Stanley is that § 12112(a) does not pro-
hibit disability-based discrimination in the abstract.   In-
stead, it bars an employer from "*discriminat[ing] against* a
qualified individual on the basis of disability."   (Emphasis
added.)   " 'Discriminate against' means treat worse," *Muld-
row* v. *St. Louis*, 601 U. S. 346, 355 (2024), and "refers to
distinctions or differences in treatment that injure protected
individuals," *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S.
53, 59 (2006).   And Ms. Stanley's complaint provides no basis
for inferring that the City's policy injured her in 2003.   To
the contrary, her complaint suggests that, when the City first
issued its policy, she was not disabled and still expected to
complete 25 years of service.   See Complaint ¶ 15; see also
Brief for Appellant in No. 22–10002 (CA11), p. 22, n. 5 (Ms.
Stanley representing that she was "unaffected by" the City's
actions as of 2003).   So the first option is off the table for
Ms. Stanley.   Even so, it may be available to others who hap-
pen to be retired at the time they sue, if they can plead and

prove they were both disabled and "qualified" when their employer adopted a discriminatory retirement-benefits policy.[4]

Turn next to the second option.   Unlawful discrimination also occurs "when an individual is affected by application of a discriminatory compensation decision or other practice." § 2000e–5(e)(3)(A).   Ms. Stanley alleges that happened to her in 2020, when her subsidized health insurance ran out. Complaint ¶ 26; see also Brief for Petitioner 24 (Ms. Stanley was "'affected by application of' the policy" in "2020 when . . . she was denied the health care subsidy"); 83 F. 4th, at 1343.   By then, however, she had been retired for two years, could not satisfy the "requirements of" her job, and was not seeking employment.   Complaint ¶ 16.   So this option, too, cannot help Ms. Stanley.   But, once more, it might help others who can show that they *were* affected by a policy change while they were "qualified individuals," even if they happen to be retired by the time they bring suit.

Now turn to the third option.   Unlawful discrimination takes place when "an individual becomes subject to a discriminatory compensation decision or other practice." § 2000e–5(e)(3)(A).   This option might be especially promising for plaintiffs in Ms. Stanley's shoes.   But, for reasons that take a little unpacking, it cannot form a basis for reversing the Eleventh Circuit's judgment in this particular case.

---

[4] To be clear, not every Title I plaintiff must plead and prove she had a disability when she suffered discrimination.   As we have seen, § 12112(a) in its present form prohibits discrimination "against a qualified individual *on the basis of* disability."   (Emphasis added.)   That provision does not require a qualified individual *to be* disabled.   So, for instance, Title I defines discrimination "on the basis of disability" to include associational discrimination—that is, discriminating against a qualified individual "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."   § 12112(b)(4). In such cases, it does not matter whether the qualified individual also happened to have a disability.   The difficulty for Ms. Stanley, however, is that her complaint does not allege anything along those lines either.

Recall that Ms. Stanley's complaint does not allege what her disability is or when it emerged.  As it happens, those facts came out later, after the district court dismissed her ADA claim, and after the parties proceeded to discovery and summary judgment on the remaining counts of her complaint.  From this later-developed record, it appears that Ms. Stanley was diagnosed with Parkinson's disease in 2016. 83 F. 4th, at 1336.

The government argues that these later-developed facts are sufficient to state a claim.  After all, during the 2-year period between her diagnosis in 2016 and her retirement in 2018, Ms. Stanley was both "an individual with a disability" and a "qualified individual" who "could still perform the essential functions of her job."  Brief for United States as *Amicus Curiae* 26–27.  During that critical window, too, the government submits, Ms. Stanley was "subject to" an "allegedly discriminatory benefits policy" that reduced her future retirement compensation.  *Id.*, at 26; see also Brief for Petitioner 25–26; *post*, at 79–80 (JACKSON, J., dissenting).

As promising as that theory may be, however, a number of case-specific problems prevent it from helping Ms. Stanley here.  For starters, because this dispute comes to us on a motion to dismiss, we cannot look beyond the pleadings. See Fed. Rule Civ. Proc. 12(d).  And her complaint says nothing about the timing or nature of her diagnosis, nor does it allege that she worked for any period of time with a disability.  To be sure, a court might, with a little more, draw a "plausible inference" that Ms. Stanley suffered discrimination between 2016 and 2018.  See *Ashcroft* v. *Iqbal*, 556 U. S. 662, 682 (2009).  So, for instance, if she had alleged that she developed Parkinson's disease before 2018, or that she worked for *any* period with *some* disability, then her case could likely proceed.  But the complaint before us does not contain any of those facts.

Even assuming we could overcome that problem, we would only face another.  The Eleventh Circuit held that Ms. Stan-

ley had affirmatively disavowed the government's theory. For support, the court pointed to Ms. Stanley's representation in her brief below that she did "not claim she was impacted by the discriminatory" City policy "during her employment." Brief for Appellant in No. 22–10002, at 22. To be sure, at oral argument Ms. Stanley told the court of appeals otherwise. Recording of Oral Arg. in No. 22–10002 (CA11, Aug. 24, 2023), at 2:45–2:58. And she attempted to adopt an *amicus* brief the government submitted to the Eleventh Circuit, advancing a theory much like the one it presses here. See Brief for United States as *Amicus Curiae* in No. 22–10002 (CA11), pp. 11–12. But applying its own rules of argument preservation, the Eleventh Circuit declined to pass on the government's theory because Ms. Stanley had not presented it to the district court and had "specifically disclaimed" it in her "own brief" on appeal. 83 F. 4th, at 1344.[5]

Complicating matters further yet, Ms. Stanley has not expressly asked us to address the Eleventh Circuit's preservation rules. Nor has she asked us to reconsider our own general practice of allowing the courts of appeals to determine for themselves what arguments they deem properly before them. See, *e. g.*, *Exxon Shipping Co.* v. *Baker*, 554 U. S. 471, 487 (2008); *Singleton* v. *Wulff*, 428 U. S. 106, 121 (1976); cf. *Retirement Plans Comm. of IBM* v. *Jander*, 589 U. S. 49, 52–53 (2020) (KAGAN, J., concurring) ("[T]he Court of Appeals may of course determine that under its usual rules of waiver or forfeiture, it will not consider those arguments"). So even if Ms. Stanley's complaint contained sufficient facts to

---

[5] While Ms. Stanley disclaimed being "impacted" by the City's policy during her employment, JUSTICE JACKSON believes that Ms. Stanley somehow still preserved the government's theory that she was "subject to" discrimination before she retired. *Post*, at 80–81. The Eleventh Circuit, however, did not see it that way. Nor does the dissent explain how, consistent with Article III, an individual can challenge a policy that she is "subject to" but that does not injure (or "impact") her. See Brief for United States as *Amicus Curiae* 25, n. 5 (acknowledging the injury requirement).

sustain the theory the government now advances, and even if she had preserved that theory below, we would still face serious obstacles to reaching it.

In saying as much, we stress that nothing we say today prevents future plaintiffs—or perhaps even Ms. Stanley herself in a future proceeding—from pursuing a theory along the lines the government proposes. It is simply that the theory cannot help Ms. Stanley in the present posture of this case.[6]

*

To sum up, we hold that, to prevail under §12112(a), a plaintiff must plead and prove that she held or desired a job, and could perform its essential functions with or without reasonable accommodation, at the time of an employer's alleged act of disability-based discrimination. A variety of suits involving retirement benefits might well proceed under that rule. But, given how this particular case comes to us, we cannot say that the court of appeals erred in upholding the dismissal of Ms. Stanley's complaint. The judgment of the Eleventh Circuit is affirmed.

*It is so ordered.*

———————

[6] One Member of the Court suggests that the government's theory can save Ms. Stanley's complaint because it "supplies the answer" to this case. *Post*, at 79 (JACKSON, J., dissenting). But to proceed as JUSTICE JACKSON suggests, we would have to abandon our precedents generally entrusting questions of issue and argument preservation to the courts of appeals. We would have to overrule the Eleventh Circuit's waiver ruling without an express invitation to do so. See *post*, at 75 (SOTOMAYOR, J., concurring in part and dissenting in part). And we would have to fault the Eleventh Circuit for failing to consider facts outside the pleading before it. All to address a question that no court passed on below and that we did not take this case to resolve. The dissent may be willing to blow past all those complications to reach its chosen destination. But we do not see how we might. Indeed, we have already gone out of our way—too far, some of our colleagues would say, see *post*, at 71–73 (opinion of THOMAS, J.)—to address Ms. Stanley's late-raised argument in order to help future plaintiffs understand how they might avoid her missteps.

Justice Thomas, with whom Justice Barrett joins, concurring in part and concurring in the judgment.

I join Parts I and II of the Court's opinion. I write separately to express my concern with the increasingly common practice of litigants urging this Court to grant certiorari to resolve one question, and then, after we do so, pivoting to an entirely different question. This case exemplifies the problem. We granted review to resolve a Circuit split regarding whether the Americans with Disabilities Act (ADA) permits suits by former employees who are no longer able to perform the essential functions of their jobs at the time of the alleged discrimination. For the first time at the merits stage, petitioner Karyn Stanley urged us to decide a different question: whether Stanley could sue based on discrimination that occurred while she was still employed and able to work. But, that theory of liability was not passed upon below because the Eleventh Circuit determined that Stanley had disavowed it, and Stanley did not seek review of the Eleventh Circuit's issue-preservation ruling. We ordinarily respect a lower court's application of its own preservation rules. I therefore would not opine on the additional question that Stanley raised for the first time in earnest at the merits stage.

I

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to [the] terms, conditions, and privileges of employment." 42 U. S. C. § 12112(a). The statute defines a "'qualified individual'" as someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8).

Stanley began working as a firefighter for the city of Sanford, Florida (City), in 1999. In 2016, Stanley was diagnosed with Parkinson's disease. And, in 2018, after 19 years of

service, that "disability forced her to retire" early. Complaint in No. 6:20–cv–00629 (MD Fla.), ECF Doc. 1, p. 3, ¶ 16. When she retired, Stanley expected to continue receiving the City's health insurance subsidy until she turned 65. At the time of her hiring, the City's policy had been to pay a subsidy until age 65 to employees who retired after 25 years of service, as well as to employees who retired early because of disability. But, unbeknownst to Stanley, the City had changed its policy in 2003. Starting in 2003, the City paid the full subsidy for retirees with 25 years of service, but for those who retired earlier due to disability, it provided the subsidy for a maximum of 24 months.

Stanley sued the City, alleging discrimination under the ADA. The District Court understood Stanley to have alleged harm caused by discrimination that occurred *after* her retirement. App. to Pet. for Cert. 24a–25a. In ruling on the City's motion to dismiss, the District Court explained that to recover under the ADA, an individual must be a "qualified individual" at the time of the alleged discrimination. *Id.*, at 24a. The District Court determined that Stanley was not a "qualified individual" after her retirement because she was not someone who could, "with or without reasonable accommodation," "perform the essential functions of the employment position that such individual holds or desires." § 12111(8); see *id.*, at 26a. Accordingly, the District Court dismissed her claim. The Eleventh Circuit affirmed, reasoning that the ADA "does not protect people who neither held nor desired a job with the defendant at the time of discrimination." 83 F. 4th 1333, 1341 (2023).

In her petition for a writ of certiorari before this Court, Stanley asked us to resolve an "important and recurring question": whether an individual who no longer "'holds or desires'" his job may sue under Title I of the ADA for discrimination with respect to the "'post-employment distribution of fringe benefits.'" Pet. for Cert. 1. In other words,

Stanley asked us to decide whether former employees who suffer postemployment discrimination can sue under the ADA. *Id.*, at 15.

Stanley mentioned over two dozen times in her petition that this question has divided the courts of appeals. In two Circuits, Stanley explained, a plaintiff need not be a "qualified individual"—that is, someone who "holds or desires" the employment position at issue—at the time of the alleged discrimination. *Id.*, at 16–18; § 12111(8). In four other Circuits, however, a plaintiff "must be a qualified individual at the time that one is discriminated against to have the right to sue under the ADA." *Id.*, at 18–20 (internal quotation marks omitted). Stanley emphasized that this Circuit split was "dispositive" in her case, as her suit was "stymied by the Eleventh Circuit's determination that she wasn't a 'qualified individual' *at the time of the discrimination*." *Id.*, at 3 (emphasis added). Stanley described the Circuit split as " 'intractable,' " "deep," "well-recognized," and "persistent." *Id.*, at 15, 21. She also conveyed a sense of urgency, telling us that the Circuit split is "growing," and unlikely to be resolved without "this Court's intervention." *Id.*, at 21.

Stanley's emphasis on the Circuit split was understandable, as it is no secret that Circuit splits get our attention. See this Court's Rule 10(a) (conveying that one of our leading considerations in deciding whether to grant certiorari is whether "a United States court of appeals has entered a decision" that conflicts with "the decision of another United States court of appeals"); see also S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice § 4.4, p. 4–11 (11th ed. 2019) ("The Supreme Court often . . . will grant certiorari where the decision of a federal court of appeals . . . is in direct conflict with a decision of another court of appeals on the same matter of federal law" (emphasis deleted)).

Stanley also emphasized in her petition that the question dividing the courts of appeals is one of "obvious importance."

Pet. for Cert. 33.   She conveyed that "[t]he circuit split matters for the forty-four million Americans with disabilities whose rights under the ADA, until the split is resolved, may depend on their employers' zip codes."   *Id.*, at 30.   "[T]he persistence of the circuit split," she told us, "means that disabled former employees only in certain parts of the country can vindicate their rights under the ADA."   *Id.*, at 30–31.

Stanley further assured us that this case would be a good one for resolving the Circuit split.   She told us that her case "cleanly tees the issue up for this Court's resolution as a pure question of law with no relevant factual disputes."   *Id.*, at 3. She reiterated that point in her reply brief at the certiorari stage, telling us that "[t]his case is a clean vehicle with no impediments" to settling the Circuit conflict once and for all. Reply to Brief in Opposition 6.

We granted certiorari, adopting the question presented as framed by Stanley.[1]   602 U. S. 1038 (2024).   I understood us to have taken the case to resolve the question that the "circuits are split over"—that is, whether the ADA permits suits by former employees who no longer hold or desire their job at the time the defendant engages in a discriminatory act. Pet. for Cert. 15 (boldface deleted); § 12111(8).   The Eleventh Circuit's position on that question was the basis for its ruling against Stanley below, see 83 F. 4th, at 1341, and Stanley had asked us to take this case to resolve precisely that question.

But, something changed after this Court granted certiorari.   In her opening brief on the merits, Stanley told us that we "need not even reach the court of appeals' erroneous holding that the [ADA] only prohibits discrimination against people who currently 'hol[d] or desir[e]' a job."   Brief for

---

[1] The question presented reads in full: "Under the Americans with Disabilities Act, does a former employee—who was qualified to perform her job and who earned post-employment benefits while employed—lose her right to sue over discrimination with respect to those benefits solely because she no longer holds her job?"   Pet. for Cert. i.

Petitioner 17. In other words, according to Stanley, we need not resolve the issue that the District Court and the Eleventh Circuit had decided. Instead, Stanley urged, we should decide a materially different question: whether Stanley could base her ADA claim on discrimination that allegedly occurred while she was *still employed* by the City. Specifically, Stanley contends that she suffered discrimination at some point after she was diagnosed with Parkinson's disease in 2016 but before she retired in 2018. Because Stanley held and desired to hold her job during this period, all agree that she was a "'qualified individual'" for at least some portion of that time. §12111(8).

The Eleventh Circuit did not opine on the merits of this theory because it determined that Stanley had expressly disavowed it in her brief before that court. 83 F. 4th, at 1344 (explaining that Stanley "affirmatively conceded" in her initial brief that she did not suffer discrimination at any point "'during her employment'"). The court acknowledged that Stanley had attempted to raise this theory at oral argument. *Id.*, at 1343. And, the court acknowledged that the United States had raised this theory in its brief as *amicus curiae*, and that Stanley had attempted to adopt that *amicus* argument. *Id.*, at 1344. But, applying its issue-preservation rules, the Eleventh Circuit determined that Stanley had not properly presented this alternative theory. *Id.*, at 1343–1344.

For the first time in her opening merits brief before this Court, Stanley asked us to reconsider the Eleventh Circuit's application of its rules. She argued that "[n]othing supports the assertion" that she conceded her alternative theory below. Brief for Petitioner 24. In her view, she "repeatedly argued" in her Eleventh Circuit brief that she suffered discrimination while employed by the City. *Id.*, at 24–25.[2]

---

[2] Appearing as *amicus curiae* in support of Stanley, the United States endorsed Stanley's new approach to this case. Brief for United States as *Amicus Curiae* 26–28. Like Stanley, the United States took issue with

Opinion of THOMAS, J.

As I see it, Stanley's conduct amounts to a bait-and-switch. She urged this Court to grant certiorari to resolve a Circuit split on one specific legal question. After we agreed to resolve that question, she redirected us to a materially different question. *Ante*, at 60 (plurality opinion) (acknowledging that "[w]e took this case to resolve a circuit split," but Stanley invites us to address "another" question).

## II

I do not join Part III of the Court's opinion because I would not opine on the merits of a new theory that Stanley did not develop at the certiorari stage.

Redirecting this Court's focus to an entirely new question at the merits stage is difficult to square with this Court's Rules. Our Rule 14.1 requires a petitioner to set forth the questions it would like this Court to decide in the petition for a writ of certiorari. "Only the questions set out in the petition, or fairly included therein, will be considered by the Court." Rule 14.1(a). Thus, our rules prevent us from reaching any question that is not "'fairly included'" in the question presented. *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U. S. Philips Corp.*, 510 U. S. 27, 31 (1993) (*per curiam*).[3]

Redirecting our focus to a different question is also highly disruptive to our deliberative process, as it often leads to a

_____

the Eleventh Circuit's conclusion that Stanley had "'disclaimed'" her alternative theory of liability below. *Id.*, at 27. And, like Stanley, the United States urged us to focus on Stanley's new theory of liability, rather than the one the Eleventh Circuit addressed. *Id.*, at 28–29.

[3] To be sure, when read in isolation, the question presented on page i of Stanley's petition might be read to include the question whether Stanley could base an ADA claim on discrimination that allegedly occurred while she was still employed. But, when read in the context of the petition as a whole, it is clear that Stanley was asking us to resolve the Circuit split she repeatedly identified: whether an employee who is no longer a "qualified individual" under the ADA may sue for "discrimination that harms her *post-employment*." Pet. for Cert. 15 (emphasis added).

lack of adversarial briefing. We take seriously the need for adversarial briefing. For example, when no party defends the judgment below, we ordinarily appoint counsel to offer argument and briefing in support of that judgment. *E. g.*, *Martin* v. *United States*, 605 U. S. 395 (2025). The absence of briefing on the legal issue before us may complicate or even thwart our efforts to resolve it. See, *e. g.*, *City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 610 (2015) (dismissing a question presented as improvidently granted in part due to a lack of "adversarial briefing").

Moreover, redirecting our focus to a different question has the effect of undermining this Court's efforts to manage its merits docket. We receive thousands of petitions each year, and the vast majority of those petitions raise issues of deep importance to the parties involved in those cases. "To use our resources most efficiently," we must confine our review to "those cases that will enable us to resolve particularly important questions." *Yee* v. *Escondido*, 503 U. S. 519, 536 (1992); accord, *U. S. Philips Corp.*, 510 U. S., at 33. If we were "to entertain questions not presented in the petition for certiorari, much of this efficiency would vanish, as parties who feared an inability to prevail on the question presented would be encouraged to fill their limited briefing space and argument time with discussion of issues other than the one on which certiorari was granted." *Yee*, 503 U. S., at 536.

We have reached issues outside the question presented "'only in the most exceptional cases,'" when required by considerations of "urgency" or "economy." *Id.*, at 535. I do not object to going beyond the question presented in such circumstances. But, there is nothing exceptional about Stanley's case. To start, had she been more transparent at the certiorari stage, I doubt this Court would have granted review of her alternative question. See this Court's Rule 10. Stanley's new theory of liability is that she can base her ADA claim on discrimination that allegedly occurred while she was still employed by the City. To address that theory,

however, we would first need to decide whether the Eleventh Circuit erroneously applied its own issue-preservation rules and erred in concluding that Stanley had disclaimed this theory below. Stanley did not petition for review of the Eleventh Circuit's issue-preservation determination. And, I doubt that we would have agreed to review the factbound application of uncontested Eleventh Circuit precedents. "A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law." *Ibid.*

Even if this Court were willing to bypass the Eleventh Circuit's issue-preservation determination, it is unlikely that we would have agreed to opine on the merits of Stanley's alternative theory in the first instance. Neither the District Court nor the Eleventh Circuit passed on whether Stanley could base her claim on events that occurred while she was still employed. That no court has decided this question is reason enough for us to decline to do so. We are "a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). We thus ordinarily wait to see if "the crucible of adversarial testing . . . , along with the experience of our thoughtful colleagues on the district and circuit benches, [can] yield insights (or reveal pitfalls) we cannot muster guided only by our own lights." *Maslenjak* v. *United States*, 582 U. S. 335, 354 (2017) (GORSUCH, J., concurring in part and concurring in judgment).

In all events, our usual practice is to respect and leave undisturbed a lower court's issue-preservation determination when that determination is not itself under review. *Single-ton* v. *Wulff*, 428 U. S. 106, 121 (1976). I see no reason to depart from that practice here.

*          *          *

Stanley asked this Court to grant certiorari to resolve a discrete Circuit split. After we agreed to do so, she asked us to resolve an entirely different legal question. I do not

find it "profitable" to reward Stanley's bait-and-switch in these circumstances. *Ante*, at 60 (plurality opinion).

I encourage litigants before this Court to remain focused on the questions presented in the petition for a writ of certiorari—and only those questions—after this Court grants certiorari. Redirecting us to a different legal question at the merits stage can be disruptive, inefficient, and unfair to all involved. Of course, Stanley is not the first litigant to resist the question presented before this Court. I hope, however, that this Court and future parties will take seriously the obligation to adhere to the question presented.

JUSTICE SOTOMAYOR, concurring in part and dissenting in part.

I join Parts III and IV, except footnote 12, of the dissent because, in my view, Title I's prohibition on disability discrimination does not cease the day an employee retires. As JUSTICE JACKSON explains, when an employer makes a discriminatory change in postemployment benefits that a retiree earned while qualified and employed, the employer discriminates against the person in her capacity as a qualified individual. See *post*, at 95–96; Brief for United States as *Amicus Curiae* 29–32. Because the Court eschews that common-sense understanding of the statutory text, I also respectfully dissent in part.

Notwithstanding the Court's error on that question, at least five Justices (four in the plurality and JUSTICE JACKSON in dissent) agree that plaintiffs in Lt. Stanley's shoes can plead disability discrimination if they were "'subject to a discriminatory compensation decision or other practice'" while a qualified individual within the majority's understanding of that term. See *ante*, at 62 (plurality opinion); see *post*, at 79–80, and n. 4 (JACKSON, J., dissenting) (explaining that Stanley and those in her "'shoes'" could recover because, "[b]efore retiring, Lt. Stanley had a disability, was a qualified individual who performed the essential functions of her job

despite that disability, and was subjected to an allegedly discriminatory policy based on her disability"). That remains true even if the employee does not file her lawsuit until after she retires, as long as she was subject to a discriminatory policy while both disabled and a qualified individual. See Brief for Respondent 30 (agreeing that a former employee need not be a "'qualified individual' at the time of the lawsuit").

There is good reason to think that Stanley herself was subject to the allegedly discriminatory policy at issue here while she was both disabled and employed. See *ante*, at 63 (plurality opinion); *post*, at 79–80 (JACKSON, J., dissenting). Yet I ultimately agree with the plurality that this theory "cannot form a basis for reversing the Eleventh Circuit's judgment in this particular case," *ante*, at 62, especially because Stanley herself did not ask this Court to review the Eleventh Circuit's holding that she had forfeited this theory before that court, *ante*, at 64–65 (plurality opinion). Because Part III nevertheless makes clear that Title I may well provide relief for retirees like Stanley, I join that portion of JUSTICE GORSUCH's opinion.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins as to Parts III and IV, except for footnote 12, dissenting.

Retirement benefits are essential building blocks of the American Dream. Workers typically earn these benefits on the job and reap the rewards after leaving the workforce. Congress has long understood that, by enabling workers to retire with dignity, independence, and security, retirement benefits are a critical aspect of job-related compensation. Thus, no one seriously disputes that the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, 42 U. S. C. § 12101 *et seq.*, prohibits disability discrimination with respect to retirement benefits. Unfortunately, however, by viewing this case through the distorted lens of pure textualism, the Court misperceives those protections today.

As I understand today's holding, the Court has decided that if a worker who has earned retirement benefits leaves the workforce (as expected) and is then discriminated against with respect to the provision of those earned benefits because she is disabled, Title I offers no protection. To get to this counterintuitive conclusion, the Court relies on Title I's "qualified individual" definition—a provision designed to protect employers from having to employ those who cannot do the work, not to cut off the rights of those who already finished it. Making matters worse, the Court has to extend itself to reach this stingy outcome, because the case before us does not present a scenario involving discrimination that took place only postemployment.

In short, the Court overlooks both the actual facts presented in this case and the clear design of the ADA to render a ruling that plainly counteracts what Congress meant to—and did—accomplish. I respectfully dissent.

I

Congress passed and President George H. W. Bush signed the ADA into law 35 years ago. This landmark legislation's overarching aim was "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for the millions of Americans with disabilities. § 12101(a)(7). Thus, Congress designed the ADA as a "comprehensive national mandate for the elimination of" disability discrimination that would "provide clear, strong, consistent, enforceable standards addressing discrimination" against disabled Americans. §§ 12101(b)(1), (2).

Title I of the ADA prohibits disability discrimination in the employment context. It protects against disability discrimination with respect to the provision of, among other things, "fringe benefits," "employee compensation," and "other terms, conditions, and privileges of employment." §§ 12112(a), (b)(2). Section 12112(a) sets forth Title I's general prohibition, which states: "No covered entity shall discriminate against a qualified individual on the basis of dis-

ability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Section 12112(b) then provides specific examples of discrimination that Title I prohibits.

As the ADA made its way through Congress, employers worried that the bill would require them to hire and retain individuals who—even with reasonable accommodations—could not satisfy a job's demands. Title I's qualified-individual provision was Congress's response to that concern. See H. R. Rep. No. 101–485, pt. 2, p. 55 (1990). Borrowing similar language from § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, 29 U. S. C. § 794, Congress inserted the "qualified individual" phrase into Title I's general prohibition, and it elsewhere defined a "qualified individual" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). The point of inserting this definition and relying on it in the ADA was simply and solely "to reaffirm that [Title I] does not undermine an employer's ability to choose and maintain qualified workers." H. R. Rep. No. 101–485, pt. 2, at 55.

Today, however, the Court takes Title I's qualified-individual definition out of context and assigns it an additional function: to act as a strict temporal limit on the reach of Title I's protections. That is, the Court reads the qualified-individual provision to mean that *only* those who hold or desire a job when alleged discrimination occurs can claim Title I's protection. See *ante*, at 65. It is on that ground that the Court concludes that Lt. Karyn Stanley—a now-retired firefighter suffering from Parkinson's disease—cannot make out a Title I claim against her former employer for (assumed) disability discrimination relating to retirement benefits that she earned in the line of duty.

In my view, for the reasons explained below, the Court is wrong twice over. It should not have used *this* case to make any pronouncements about the viability of a Title I discrimi-

nation claim that arises after an employee retires. And it misreads Title I to introduce a time-related limitation that appears nowhere in the statute Congress wrote.

## II

### A

Because this case arises from a Federal Rule of Civil Procedure 12(b)(6) dismissal of Lt. Stanley's complaint, we are required to "accept as true all the factual allegations in h[er] complaint." *Manuel* v. *Joliet*, 580 U. S. 357, 360, n. 1 (2017). We must also assess Lt. Stanley's complaint "as a whole," credit all "plausibl[e]" allegations, and "draw reasonable inferences" in her favor. *National Rifle Association of America* v. *Vullo*, 602 U. S. 175, 194 (2024).

Like the majority, I will start by assuming that what Lt. Stanley alleges to be discriminatory conduct by the city of Sanford, Florida (City), in fact violated the ADA. *Ante*, at 52. Doing so, what follows are the facts.

Lt. Stanley was employed as a firefighter by the Sanford Fire Rescue Department for just shy of two decades. Complaint in No. 6:20–cv–00629 (MD Fla.), ECF Doc. 1, p. 2, ¶ 4. She started in 1999 and was promoted to Lieutenant in 2005. *Id.*, at 3, ¶¶ 13–15. Lt. Stanley remained continuously employed in that position until November 2018, when she was forced to take disability retirement due to her physical disability. *Ibid.*, ¶ 16.[1]

Notably, while Lt. Stanley was still employed, the City changed its disability-retirement policy. At the time Lt. Stanley was hired, the City's policy was to pay for disabled retirees' health insurance until retirees turned 65 years old. *Id.*, at 4, ¶ 19. In 2003, the City changed that policy to offer

---

[1] Although not alleged in Lt. Stanley's complaint, the summary-judgment record on her non-ADA claims reflects that she was diagnosed with Parkinson's disease in 2016. See 83 F. 4th 1333, 1336 (CA11 2023).

a maximum of 24 months of healthcare coverage for disabled retirees. *Ibid.*, ¶ 20. This change meant that Lt. Stanley was subject to the new policy from 2003 onward, including the period from when she became disabled (while she was still employed) until she retired. *Ibid.*

Lt. Stanley's complaint alleges that the City's "taking away" of the prior disability-insurance policy denied disabled retirees like her "equal access to health insurance." *Id.*, at 8, ¶ 37. She further alleges that the new 24-month coverage policy violates the ADA in and of itself. *Ibid.* All agree that, under the Lilly Ledbetter Fair Pay Act, 123 Stat. 5, an unlawful employment practice occurs when a plaintiff "becomes subject to a discriminatory compensation decision or other practice." 42 U. S. C. § 2000e–5(e)(3)(A).[2]

Based on the facts Lt. Stanley alleges, the Fair Pay Act framework supplies the answer to the question presented in this case.[3] Before retiring, Lt. Stanley had a disability, was a qualified individual who performed the essential functions of her job despite that disability, and was subject to an allegedly discriminatory policy based on her disability, insofar as the City changed its retirement-benefits package in a manner that disadvantaged disabled retirees. See Brief for United States as *Amicus Curiae* 26–27. Thus, it made no sense for the City to argue for dismissal of Lt. Stanley's ADA claim (as it did) on the ground that she was not a qualified individual at the relevant time.

On the facts as alleged in her complaint, the City subjected Lt. Stanley to the discriminatory policy *during* her employ-

---

[2] "[A]n unlawful employment practice" also occurs under the Fair Pay Act "when a discriminatory compensation decision or other practice is adopted" or "when an individual is affected" by it. 42 U. S. C. § 2000e–5(e)(3)(A).

[3] That question is: "Under the [ADA], does a former employee—who was qualified to perform her job and who earned post-employment benefits while employed—lose her right to sue over discrimination with respect to those benefits solely because she no longer holds her job? " Pet. for Cert. i.

ment, not only after she retired.[4]   So, Lt. Stanley was performing the essential functions of her job at the preretirement point at which she became disabled and was subjected to the new policy.   This made her a qualified individual, notwithstanding the City's counterfactual contention.

## B

### 1

The Court has decided not to resolve this case on that straightforward ground.   A plurality of the Court says, instead, that "case-specific problems prevent [those facts] from helping [Lt.] Stanley here."   *Ante*, at 63.   Even setting aside the plurality's failure to accept Lt. Stanley's plausible factual allegations and to draw reasonable inferences in her favor, I disagree with its analysis of the "case-specific problems."   In my view, none of the plurality's concerns precludes this Court from resolving this case based on the factual allegations in Lt. Stanley's complaint.

First, the plurality says Lt. Stanley's complaint does not allege her diagnosis, its timing, and whether she had the disability while she was still working.   See *ibid.*   But her complaint tells us that she had a disability and eventually had to retire because of it.   This is enough to draw a "plausible inference" that she worked with a disability and was thus subject to the discriminatory policy some time before retiring.   *Ashcroft* v. *Iqbal*, 556 U. S. 662, 682 (2009).

Second, the plurality claims that, in the proceedings below, Lt. Stanley "affirmatively disavowed" the argument that she was discriminated against while still working.   *Ante*, at 64.   Not so.   All she said was that she did " 'not claim she was *impacted* by the discriminatory' City policy 'during her em-

---

[4] Accordingly, I agree fully with the plurality's conclusion that § 2000e–5(e)(3)(A) "might be especially promising for plaintiffs in [Lt.] Stanley's shoes."   *Ante*, at 62.

ployment.'" *Ibid.* (quoting Brief for Appellant in No. 22–
10002 (CA11), p. 22; emphasis added).   But whether some-
one was *impacted* (affected) by a policy is distinct from
whether they were *subject* to it.   See §2000e–5(e)(3)(A).

Third, the plurality contends that, in "applying its own
rules of argument preservation, the Eleventh Circuit de-
clined to pass" on Lt. Stanley's "theory" that she was dis-
criminated against during her employment, and that this
Court did not grant certiorari to decide whether *that* assess-
ment was correct.   *Ante*, at 64–65.   But Lt. Stanley's "the-
ory" was merely a response to the City's argument that her
complaint failed to state a claim.   Moreover, the allegation
that the relevant discriminatory act took place while she was
still on the job tees up the question we did grant certiorari
to address: "Under the [ADA], does a former employee—who
was qualified to perform her job and who earned post-
employment benefits while employed—*lose* her right to sue
over discrimination with respect to those benefits solely be-
cause she no longer holds her job?"   Pet. for Cert. i (empha-
sis added).   Lt. Stanley maintains that she states a claim for
discrimination under the ADA with respect to retirement
benefits she earned while working despite the fact that she
no longer holds the job.   The question presented neither
states nor suggests that the employer's act of discrimination
took place only *after* Stanley retired.[5]   And, to the extent
such timing is even relevant, answering the question Lt.
Stanley actually presented in light of her contention that the

---

[5] Indeed, as quoted, the actual question presented asks whether Lt.
Stanley "lose[s] her right to sue over discrimination with respect to [re-
tirement] benefits *solely* because she no longer holds her job."   Pet. for
Cert. i (emphasis added).   But, no matter, says the majority; from the
outset, it chooses to answer an entirely different query: "whether a retired
employee who does not hold or seek a job is a 'qualified individual.'"
*Ante*, at 49.   That shift is telling.   Even as the majority extols the virtues
of textualism, it has completely rewritten the text of the question that
Stanley actually presented, presumably to reach its desired result.

discrimination occurred while she was still working is the only framing that is actually consistent with the facts alleged in Lt. Stanley's complaint.

2

What is more, "[o]ur traditional rule is that '[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.'" *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 379 (1995) (quoting *Yee* v. *Escondido*, 503 U. S. 519, 534 (1992); second alteration in original). And, here, nobody disputes that Lt. Stanley preserved the claim that the City discriminated against her in violation of the ADA by changing her retirement benefits. Lt. Stanley's contention that she was subject to the allegedly discriminatory policy while she was still an employee "is—at most—'a new argument to support what has been [her] consistent claim.'" *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 331 (2010) (quoting *Lebron*, 513 U. S., at 379).

If the traditional rule applies anywhere, it should be in a case of this nature. This claim was brought by a disabled firefighter suffering from Parkinson's who has consistently maintained that the City's change to its retirement-benefits policy (implemented while she was an employee) discriminates against disabled beneficiaries. If we extend leniency to professional advocacy organizations when they craft allegations, see, *e. g.*, *Citizens United*, 558 U. S., at 331, it seems only fair to extend that same grace to those with limited resources to game out long-term litigation strategies.[6]

---

[6] Only time will tell whether the Court is as eager to apply today's stringent argument-preservation approach to major corporations and professional advocacy organizations as it is to use this line of reasoning to dismiss the claims of a retired firefighter suffering from Parkinson's. Cf. *Diamond Alternative Energy, LLC* v. *EPA*, 606 U. S. 100, 145 (2025) (JACKSON, J., dissenting).

Moreover, it bears noting that this case comes to us on review of a complaint, which need only plead facts sufficient to support a claim, not comprehensive legal theories. See *Skinner* v. *Switzer*, 562 U. S. 521, 530 (2011). If we were reviewing a summary judgment or trial record developed on Lt. Stanley's district-court legal theories, the plurality might have a point. But, at the pleading stage, a legal claim rises or falls based on the facts—not theories—alleged.

If all that were not enough, the case record here establishes that Lt. Stanley *tried* below to make the point that the discriminatory act she was complaining of occurred during her employment, once the City made timing an issue. For instance, Lt. Stanley's opening brief to the Eleventh Circuit incorporated the Government's *amicus* brief, which argued that, contrary to what the City had asserted, Lt. Stanley had suffered the alleged discrimination *while employed*. Brief for Appellant in No. 22–10002, at viii, 10; Brief for United States as *Amicus Curiae* in No. 22–10002, pp. 5, 11–21; see also Reply for Appellant in No. 22–10002, pp. 4–13. Lt. Stanley and the Government also made this point repeatedly to the Eleventh Circuit at oral argument. Recording of Oral Arg. in No. 22–10002 (Aug. 24, 2023), at 0:35–5:50, 6:00–7:30, 8:20–9:20.

It is true that, instead of accepting the facts as Lt. Stanley alleged them (and as the Federal Rules and our precedents require), the Eleventh Circuit rejected Lt. Stanley's and the Government's attempts to set the record straight about the timing question. But it is odd, to say the least, that Lt. Stanley is now being penalized for her thwarted earlier attempts to assert that the City's discriminatory actions occurred while she was still an employee—especially when she might have been able to make that point here if she had skipped saying this to the Eleventh Circuit entirely and had pointed it out to us in the first instance. Cf. *Citizens United*, 558 U. S., at 331 (holding that parties can make any

argument in this Court to support their claim, even one not raised below).[7]

### 3

Regardless of how the Eleventh Circuit handled the allegations in this case, in my view, we need to remember that our Court's role is to decide what the law is for the entire Nation. That reach carries with it the heightened responsibility to tether the legal principles we pronounce to the facts of the case before us, lest we not only create unfairness for particular parties but also allow a poor vehicle to drive us— and the law—astray. Considering questions of law divorced from the actual facts raises doubts about our authority under Article III. See, *e.g.*, *Public Workers* v. *Mitchell*, 330 U. S. 75, 89 (1947) ("[F]ederal courts established pursuant to Article III of the Constitution do not render advisory opinions"). It also risks error, because it is far more difficult to correctly address legal issues on facts that do not implicate the question presented.

The discrepancy between real life and our legal decision-making matters in concrete and demonstrable ways. A retiree who alleges disability discrimination that first occurs only after they have retired is in a materially different position from one who was subjected to that same discriminatory action during her employment. See Brief for United States as *Amicus Curiae* 11 ("When an employer makes a discriminatory change in a plaintiff's post-employment benefits, it retroactively alters the plaintiff's terms or conditions of em-

---

[7] One might even argue that our decision to grant certiorari in the first place signaled our decision to set aside the alleged forfeiture problem, which the City had asserted in its brief in opposition. Brief in Opposition 30–31. Lt. Stanley, the Government, and knowledgeable observers would be forgiven for reasonably presuming that the Court had "necessarily considered and rejected" this purported obstacle to its review when we opted to grant Lt. Stanley's petition. *Stolt-Nielsen S. A.* v. *AnimalFeeds Int'l Corp.*, 559 U. S. 662, 670, n. 2 (2010); see also *United States* v. *Williams*, 504 U. S. 36, 40 (1992).

ployment and changes the compensation she earned as an employee performing the essential functions of her job—that is, as a qualified individual"). Whether or not Title I covers *that* circumstance does not answer whether a plaintiff like Lt. Stanley—who did not suffer a retroactive change to her terms and conditions of employment, but was instead subjected to the allegedly discriminatory policy *while* employed—can sue.

When we realized that Lt. Stanley's case does not present a circumstance of discrimination that occurs only after one's employment ends, we had two reasonable options. We could have applied our traditional rule, allowing Lt. Stanley to make all arguments in support of her claim, and then considered how the alleged facts of her case fare under the law as we understand it. Alternatively, we could have dismissed the writ of certiorari as improvidently granted and awaited a true case of postemployment discrimination to decide that question. Instead, the Court chooses door number three: to close its eyes to what Lt. Stanley actually alleges and use her case nonetheless to answer an important legal question that does not arise from the facts in her complaint. Thus, in this of all cases, the Court abandons "its considered practice not to decide abstract, hypothetical or contingent questions." *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, 461 (1945); cf. *McCoy* v. *Louisiana*, 584 U. S. 414, 429 (2018) (ALITO, J., dissenting) ("The Constitution gives us the authority to decide real cases and controversies; we do not have the right to simplify or otherwise change the facts of a case in order to make our work easier or to achieve a desired result").

I think plowing forward to make new pronouncements of law when the alleged facts do not implicate the rule we are announcing is a mistake. That Lt. Stanley suffered discrimination during her employment is not a disposable "theory." It is the only lens through which we can accurately—and properly—view her case.

## III

The second misstep that the Court makes in this case is to construe Title I of the ADA to allow employers to engage in postemployment discrimination. The text of the statute itself says nothing—zero—about the preemployment or postemployment timing of an act of disability discrimination. Nevertheless, the Court homes in on one isolated provision (the qualified-individual definition), detaches it from its place in the overall scheme, and converts it into a strict limitation on the temporal reach of Title I's protection.

In my view, settled law requires a different path. We should have followed the method this Court employed when it addressed a comparable question of statutory interpretation in *Robinson* v. *Shell Oil Co.*, 519 U. S. 337 (1997). There, we held that "employees" in Title VII covers former employees. *Id.*, at 346. To reach that conclusion, we analyzed the text, context, and purposes of the provisions at issue. Applied here, those indicators confirm that Title I prohibits disability discrimination in the postemployment payout of benefits earned during an employee's tenure.

### A

*Robinson* first says to consider whether the statute's text supplies "a plain and unambiguous" answer to the question of what the statute allows. *Id.*, at 340. The "inquiry must cease" at text alone only "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Ibid.* (quoting *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 240 (1989)). Title I's text and overall scheme do not foreclose—much less unambiguously so—retirees' ability to sue over discrimination in the postemployment payout of benefits they earned on the job.

Consider first what Title I's text does *not* say. Title I does not categorically exclude former employees or retirees from the ADA's protection. Nor does it explicitly carve out postemployment discrimination as nonactionable. Nothing

in the statute actually says that one must currently hold or desire a job to obtain protection from the forms of disability discrimination that Title I prohibits. And Title I does not place a temporal limit on the reach of its protections.

What the text of Title I *does* plainly convey is broad protection for workers against disability discrimination with respect to job-related benefits. Section 12112(a)'s general prohibition bars disability discrimination "in regard to" both "employee compensation" and "other terms, conditions, and privileges of employment." Section 12112(b)(2) also specifically prohibits disability discrimination by "an organization providing fringe benefits to an employee of the covered entity." As I explain in Part IV, *infra*, those terms capture deferred compensation that workers earn during employment and then receive during retirement.

So where does the majority find its purported temporal limit on Title I's protections? Almost exclusively in the statute's qualified-individual definition. Recall that § 12112(a) prohibits disability discrimination against a "qualified individual," which § 12111(8) defines as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Based on the text and tense of this provision, the majority concludes that Title I offers no protection to an individual who does not presently hold or desire a job. See *ante*, at 52–53. It reaches that result by reading the qualified-individual definition to apply equally to two scenarios. See *ante*, at 55–56. The first scenario is where someone seeks to keep or obtain a job, but finds that aspiration stymied by disability discrimination. The second scenario is where someone previously had a job (for which they were qualified), but suffers postemployment discrimination in the payout of job-related benefits.

The false equivalence of these two very different scenarios fuels the majority's effort to sustain a textualist case for a temporal limitation. But nothing in the text compels it. It

is perfectly permissible to read the qualified-individual definition as setting a conditional mandate: *If* a plaintiff relies on Title I regarding a job she seeks to obtain or hold, *then* she must be able to perform the essential functions of that job.   Brief for Petitioner 3.   Conditional mandates like this appear in daily life.   Imagine seeing a sign that reads: "To live in this apartment building, you must be able to clean up after the pets that you own."   *Ibid.*   No one would read that rule as requiring tenants to own pets; rather, it is a conditional mandate that applies *if* tenants have pets.   *Ibid.*[8]

Read that way, the qualified-individual mandate operates to protect employers from having to extend employment to those who cannot do a job.   See Part III–B, *infra*.   It says nothing about the time at which the alleged discrimination must occur relative to one's period of employment.[9]

The majority runs in a series of textualist circles, attempting to find the explicit temporal limit it seeks in the qualified-individual definition's text.   But it comes up short of anything to confirm that the qualified-individual definition is an

———————

[8] Lt. Stanley offers another example from an actual statute, which provides that NASA "shall make one annual award" to "[t]he amateur astronomer . . . who in the preceding calendar year discovered the intrinsically brightest near-Earth asteroid."   51 U. S. C. § 30902(c)(3)(A); see Brief for Petitioner 36.   It then defines "amateur astronomer" as "an individual whose employer does not provide any funding, payment, or compensation to the individual for the observation of asteroids."   § 30902(b)(1).   Does an unemployed astronomer qualify?   Of course.   In context, the "amateur astronomer" definition imposes a conditional mandate that applies *if* an individual is employed.

[9] The majority responds that Congress could have written Title I differently to make the conditionality of the qualified-individual mandate clearer.   See *ante*, at 55–56.   But critiques of that sort cut both ways: If Congress had wanted to restrict all of Title I's protections to only those who hold or desire a job (as opposed to retirees), it surely could have made that explicit too.   See, *e. g.*, *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997) ("That the statute could have expressly included the phrase 'former employees' does not aid our inquiry.   Congress also could have used the phrase 'current employees'").

JACKSON, J., dissenting

expression of Congress's temporal limit on all of Title I. And the reality is that Title I's text contains neither an express prohibition against nor authorization for retiree lawsuits challenging postemployment discrimination. Because text alone does not supply an unambiguous answer, *Robinson*'s framework tells us to proceed to understand the context in which the "qualified individual" definition appears in Title I, as well as the point of that provision—*i. e.*, what, exactly, Congress designed that definition to do.

B

Congress incorporated the qualified-individual provision into Title I of the ADA to address a particular problem. Its legislative history makes clear that, by adding this provision, Congress simply "intend[ed] to reaffirm that [Title I] does not undermine an employer's ability to choose and maintain qualified workers." H. R. Rep. No. 101–485, pt. 2, at 55. Congress was responding to businesses' concerns that protecting disabled workers would mean requiring employers to hire employees whose disabilities could threaten "the health or safety of others," damage "property," or prevent the completion of the work. *Id.*, at 56. Could a jewelry store in search of a security guard require "[m]obility and dexterity" from an applicant? *Ibid.* Or, if a job involved lifting 50-pound boxes, could an employer require applicants to be able to lift that much weight? *Id.*, pt. 3, at 36.

Congress added the qualified-individual provision to make clear that the answer to these and similar questions was *yes*. *Ibid.* It explained that, "[a]s with other civil rights laws prohibiting discrimination in employment," Title I would not "limit the ability of covered entities to choose and maintain a qualified workforce." *Id.*, at 35–36. Employers could "hire and employ employees who can perform the job" and use "job-related criteria" in making those determinations. *Id.*, at 36. In other words, Congress designed the provision to "ensure that employers can continue to require that all ap-

plicants and employees, including those with disabilities, are able to perform the essential, i. e., the non-marginal functions of the job." *Id.*, pt. 2, at 55.

The "qualified" aspect of Title I's protection thus recognizes that, in certain situations, employers may lawfully discriminate against applicants and current employees based on disability. Specifically, employers may do so if disability renders someone unable to perform the essential functions of a job that she holds or desires. And that makes perfect sense when a plaintiff seeks Title I's protection with respect to hiring, promotion, or firing determinations. *E. g., Cleveland* v. *Policy Management Systems Corp.*, 526 U. S. 795, 806 (1999) (wrongful-discharge plaintiff had to show she could "'perform the essential functions' of her job").

A retiree seeking to remedy discrimination as to the payout of benefits already earned on the job, by contrast, does not trigger the concerns that motivated Congress to craft a qualified-individual metric. See, *e. g., Castellano* v. *New York*, 142 F. 3d 58, 68 (CA2 1998) ("Where the alleged discrimination relates to the provision of post-employment benefits, rather than to hiring, promotion, or firing, Congress's expressed concern about qualifications is no longer implicated"). Unlike allowing disability discrimination against someone who is or seeks to be in the workforce but cannot do the job, authorizing disability discrimination against a retiree who was in the workforce, but has now left it, has *nothing* to do with the problem Congress was addressing when it imposed the conditions in the qualified-individual definition.

The long and short of it is that the qualified-individual provision's function is to protect employers from having to hire and maintain employees who cannot do the work. That provision is not designed to serve as a temporal limit that extinguishes the rights of those who already did the work and have now left the job. Nor does it make any *sense*—given Title I's overall scheme—for the qualified-individual provi-

sion to moonlight as such a temporal restriction. If Congress had wanted the qualified-individual definition to do the work of cutting off discrimination claims that arise after retirement, it easily could have said so.

C

It is clear, then, that the majority has commandeered Title I's qualified-individual definition and used it to steer today's legal analysis through wholly inapposite terrain. Doing this not only diverges from Congress's design but also leads to anomalous results. That is, even as the majority assumes that Title I protects retirement benefits, it adopts an interpretation that severely undermines those protections, rendering them null just when they matter most. Worse still, the majority's reading of this statute counteracts the objective of the qualified-individual provision—the very provision on which the majority's holding turns.

Under the majority's logic, if an employer cuts off an employee's entitlement to retiree health benefits (because of their disability) one day *before* they retire, the employee can sue. But if the employer waits until one day *after* that employee's retirement (assuming the employee no longer desires the job they held), Title I offers them no protection.

Imagine a janitor who is deaf. She works decades at a school, performing all essential functions of her job. During that time, she earns retirement benefits, including postemployment health insurance and a pension. After she retires, the school cuts off her employer-provided retirement benefits on the ground that "it was always a nuisance to have to accommodate her all those years"—*i. e.*, because of her deafness. Does Title I protect her against this blatant disability discrimination? Per today's holding, the majority says no. Even though the school has taken away job-related benefits that the janitor earned during her working years, she is out of luck because—the majority reasons—Title I's protections are limited only to those who hold or desire a job.

Arbitrariness abounds. If the retired janitor remains able to perform the essential functions of her job, and if she still wants to work, then she can bring a Title I suit to challenge the school's discrimination in the payout of retirement benefits she already earned. But if she can no longer perform the essential functions of her job, or if she simply no longer desires a job, then she cannot. See Brief for AFL–CIO as *Amicus Curiae* 5. But *why* would Congress hinge the retired janitor's protection against discrimination in the benefits she earned while working on whether she wants and can perform a job in the future? While she was working, she could perform the essential functions of her job and thereby earned the benefits in question—isn't *that* what matters in any coherent and consistent scheme designed to protect against disability discrimination? [10]

It is illogical to conclude that, while Congress wanted to protect against discrimination with respect to retirement benefits, it crafted a statute that implicitly cuts off those protections the moment a worker last clocks out. Holding as much allows employers to evade Title I's retirement-benefit protections by bait and switch. They need not refrain from discrimination; all they have to do is wait.

IV

Rather than unfastening the qualified-individual definition from the objective that compelled it and construing that provision to limit the broad protections that the ADA confers, I would adopt the statutory reading most consistent with the

---

[10] The majority's blinkered focus leads to other oddities too. What if the retired janitor can no longer perform her janitorial work, but she takes on a lighter job with a different employer? Without question, she "can perform the essential functions of the [new] employment position that [she] holds." 42 U. S. C. § 12111(8). Given that she currently holds a job, can she now (even under the majority's reading) sue her *former* employer for its disability discrimination with respect to her retirement benefits? Following the majority's textualism to its logical conclusion, the answer suddenly would seem to be yes.

JACKSON, J., dissenting

overall design of Title I. Congress passed the ADA to protect people with disabilities, and it crafted Title I, in particular, to provide disabled workers with meaningful protections against disability discrimination in the provision of job-related retirement benefits. To properly evaluate the intended scope of Title I's protections, courts need to situate its provisions within that broader context.

A

At our best, this Court has appreciated the ADA's "broad mandate" and "sweeping purpose" for remedying "widespread discrimination against disabled individuals." *PGA TOUR, Inc.* v. *Martin*, 532 U. S. 661, 674–675 (2001). We have called the statute's " 'comprehensive character' " one of its " 'most impressive strengths.' " *Id.*, at 675. And we have seen it as Congress designed it—" 'a milestone on the path to a more decent, tolerant, progressive society.' " *Ibid.* Reading Title I to prohibit postemployment discrimination in the provision of retirement benefits (as I do) aligns with the broader purposes of the ADA. Retirement benefits are an essential aspect of the "equality of opportunity, full participation, independent living, and economic self-sufficiency" that the ADA promotes. § 12101(a)(7). They are also one of "those opportunities for which our free society is justifiably famous," and Congress wanted to ensure that disabled Americans could enjoy them, too. § 12101(a)(8).

In other words, Title I's protections encourage disabled Americans to enter the workforce and have an equal opportunity to earn *all* that a good job brings to workers and their families. Retirement benefits are a key piece of that pie. Brief for AARP et al. as *Amici Curiae* 19 (describing retirement benefits as a key factor in workers' job-related decisions). After all, workers often decide whether to enter the workforce, and when to leave, based on the terms of such benefits. Protecting disabled Americans' right to receive all that they earned during their working years—free from dis-

ability discrimination in retirement—is essential to a faithful application of Congress's handiwork.

The majority skips past these anchoring objectives; it hastily assumes Congress wanted to confer protection against job-related disability discrimination (to include discrimination related to the provision of retirement benefits), *ante*, at 57, but then treats the many provisions of the ADA that demonstrate this congressional purpose as irrelevant to an interpretation of Title I's reach, *ante*, at 57–58. In my view, Congress's clear aims are not so easily avoided.

A comprehensive look at Title I reveals its protection of retirement benefits in at least three places. Section 12112(a)'s general prohibition bars disability discrimination "in regard to" *both* "employee compensation" *and* "other terms, conditions, and privileges of employment." Additionally, §12112(b)(2) prohibits disability discrimination by "an organization providing fringe benefits to an employee of the covered entity." Legislative history reinforces that Congress inserted these phrases into Title I to protect pensions, health insurance, and other benefits that employers promise to give their employees upon retirement. See H. R. Rep. No. 101–485, pt. 2, at 54–55 (noting that Title I covers "the range of employment decisions," including those concerning "fringe benefits available by virtue of employment"); see also *id.*, pt. 3, at 36 (prohibiting adoption of different "benefits" for disabled employees); *id.*, at 38 ("[E]mployers may not deny health insurance coverage completely to an individual based on the person's . . . disability").

Congress also crafted Title I knowing that courts had construed these terms in similar statutes to include retirement benefits. This Court had held, for example, that a "benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship." *Hishon* v. *King & Spalding*, 467 U. S. 69, 77 (1984). It had thus made clear that "[p]ension benefits" "qualify as terms, conditions, or privileges of employment

even though they are received only after employment terminates." *Ibid.* Five Justices had also reasoned that "[t]here is no question that the opportunity to participate in a deferred compensation plan constitutes a 'conditio[n] or privileg[e] of employment,' and that retirement benefits constitute a form of 'compensation.'" *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073, 1079 (1983) (Marshall, J., joined by Brennan, White, Stevens, and O'Connor, JJ., concurring in judgment in part) (footnote omitted). And the Court had further clarified that "[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion." *Hishon*, 467 U. S., at 75.

B

This backdrop highlights not only that Congress viewed retirement benefits to be a protected form of employee compensation, but also *how* Congress intended for this particular form of protection from disability discrimination to operate. To be specific: Retirement benefits are *not* payments to retirees for something they do postemployment (*i. e.*, when they neither have nor desire a job). Rather, as we held in an analogous context just before the ADA's passage, "retirement benefits are deferred compensation for past years of service rendered." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 808, 810 (1989) (interpreting statute that consented to state "'taxation of pay or compensation for personal service as an officer or employee of the United States'" to cover federal retirement benefits, because they are compensation for service as a federal employee). Thus, as we recognized in *Davis*, although workers receive these benefits after they retire, workers earn these benefits as employees—*during* their employment. *Ibid.*

If an employer alters the payout of benefits based on an employee's disability after that individual's employment ends—say, by reducing pension benefits—the employer has

discriminatorily changed the terms and conditions of employ-
ment that the individual was subject to while working.[11]
The retiree earns those benefits as an employee; therefore,
the postemployment adverse action retroactively discrimi-
nates against that previously qualified individual.   See Brief
for United States as *Amicus Curiae* 29–32.   So, even as-
suming (as the majority does) that the individual's qualifi-
cations are apposite to this particular scope-of-coverage
question (but see Part III–A, *supra*), the individual could
perform the job's essential functions when it mattered—
when the individual earned the benefits.

The Government proffers an illustrative hypothetical.
Imagine "a statute prohibiting airlines from discriminating
against a 'qualified passenger' in the 'terms, conditions, or
privileges of carriage' and defining a 'qualified passenger' to
mean someone who 'meets the carrier's eligibility require-
ments for the flight on which the passenger is flying or seeks
to fly.'"   Brief for United States as *Amicus Curiae* 31.
What happens if the airline discriminates against the individ-
ual in the handling of their baggage at their destination,
after they debark?   The majority would say, too bad—the
individual is no longer a "qualified passenger."   But I would
read the statute in context, as the Government does: The
individual was qualified during the relevant period; the dis-
crimination relates to their act of flying with the airline as a
passenger; and this is the type of discrimination that the
statute was designed to stop.   This reading follows from the
text, context, and primary purpose of the statute—it renders
the provision in question part of a coherent and consistent
overall scheme.

So it is here.   A retiree who worked and earned benefits
as a qualified individual, then suffered discrimination at the

---

[11] This is not what happened here, of course.   Lt. Stanley was subject
to the discriminatory policy that she now challenges while she was still
working.   Yet the consequence of the majority's broad holding is that the
retiree I describe above would have no recourse under Title I.

payout stage for those benefits in retirement, is covered by Title I's protections. On such facts, fairly interpreted, the employer has "discriminate[d] against a qualified individual . . . in regard to . . . employee compensation." § 12112(a). That is precisely what Title I prohibits.

C

Waving off Congress's broader objectives, the majority notes that legislation does not "pursu[e] its stated purpose at all costs." *Ante*, at 58 (internal quotation marks omitted). This common rejoinder attacks a strawman. Looking to a statute's purposes helps us to understand—not override— that statute's text. And while legislators may not pursue their purposes "at all costs," such calibrations and the compromises they reflect do not make legislative purposes irrelevant to a full and fair evaluation of what a statutory provision means, as the majority suggests.

Too often, this Court closes its eyes to context, enactment history, and the legislature's goals when assessing statutory meaning. I cannot abide that narrow-minded approach. If a statute's text does not provide a clear answer to a question, it is not our role to keep twisting and turning those words until self-confirmatory observations solidify our "first blush" assumptions. *Robinson*, 519 U. S., at 341.[12]

_____

[12] The majority's contention that I reject " 'pure textualism' [as] insufficiently pliable to secure the result [I] seek," *ante*, at 57, stems from an unfortunate misunderstanding of the judicial role. Our interpretative task is not to seek our own desired results (whatever they may be). And, indeed, it is precisely because of this solemn duty that, in my view, it is imperative that we interpret statutes consistent with all relevant indicia of what *Congress* wanted, as best we can ascertain its intent. A methodology that includes consideration of Congress's aims does exactly that— and no more. By contrast, pure textualism's refusal to try to understand the text of a statute in the larger context of what Congress sought to achieve turns the interpretive task into a potent weapon for advancing judicial policy preferences. By "finding" answers in ambiguous text, and not bothering to consider whether those answers align with other sources of statutory meaning, pure textualists can easily disguise their own prefer-

Courts should remember that "[l]egislation has an aim; it seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government." F. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 538–539 (1947). Viewing a statute's text in light of its aims allows us to "carr[y] out Congress' likely intent in enacting the statutory provision before us." *Zuni Public School Dist. No. 89* v. *Department of Education*, 550 U. S. 81, 93 (2007). Crucially, this keeps us to our proper role as judges in a democratic system. See *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 542 (1940) (courts' role in interpreting statutes is "to construe the language so as to give effect to the intent of Congress").

Here, instead of rendering Title I's retirement-benefit protections an empty promise by adopting a reading "destructive of [its] purpose," the Court should have adopted the reading that is not only plainly text-based but is also "more consistent with the broader context of [Title I] and the primary purpose of" its protections. *Robinson*, 519 U. S., at 346. In my view, in the absence of any clear temporal limitation on the scope of Title I, the best interpretation would permit those who were qualified enough to earn benefits while working to seek a remedy for postemployment discrimination in the payout of those benefits.

\*   \*   \*

Disabled Americans who have retired from the workforce simply want to enjoy the fruits of their labor free from discrimination. Congress plainly protected their right to do so when it crafted Title I. Yet, the Court ignores that right today. It reaches out to cut off postemployment protection against disability discrimination in a case that does not re-

---

ences as "textual" inevitabilities. So, really, far from being "insufficiently pliable," I think pure textualism is incessantly malleable—that's its primary problem—and, indeed, it is certainly somehow always flexible enough to secure the majority's desired outcome.

quire us to decide that question; seizes upon the inapposite text of the qualified-individual definition; and converts that text into a temporal limit it was never designed to be. Worse still, by doing all this, the Court renders meaningless Title I's protections for disabled workers' retirement benefits just when those protections matter most.

It is lamentable that this Court so diminishes disability rights that the People (through their elected representatives) established more than three decades ago. Even so, there is hope for a legislative intervention to fix the mistake the Court has made. Americans with disabilities have proven time and again that they can overcome long odds in fighting for their own equality. When that happens, my one wish would be for this Court to stay out of their way.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None