RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

GUN OWNERS OF AMERICA, INC.; GUN OWNERS
FOUNDATION; VIRGINIA CITIZENS DEFENSE LEAGUE;
MATT WATKINS; TIM HARMSEN; RACHEL MALONE,

         *Plaintiffs-Appellants*,

    *v.*

PAMELA BONDI, Attorney General; UNITED STATES
DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL
DRISCOLL, in his official capacity as Acting Director,
Bureau of Alcohol, Tobacco, Firearms, and
Explosives,

         *Defendants-Appellees*,

GUN OWNERS OF CALIFORNIA, INC.,

         *Movant.*

No. 25-1282

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-01429—Paul Lewis Maloney, District Judge.

Decided and Filed: March 2, 2026

Before: BATCHELDER, WHITE, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:** Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Stephen D. Stamboulieh, STAMBOULIEH LAW, PLLC, Olive Branch, Mississippi, Kerry Lee Morgan, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, Oliver M. Krawczyk, AMBLER LAW OFFICES, LLC, Carlisle, Pennsylvania, for Appellants. Simon G. Jerome, Thomas Pulham, Brad Hinshelwood, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

**OPINION**

---

MURPHY, Circuit Judge.  Federal law allows a "prevailing party" to seek reimbursement for attorney's fees in suits against a federal agency unless the agency's "position" was "substantially justified."  28 U.S.C. § 2412(d)(1)(A).  This case asks whether the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was "substantially justified" in treating rifles fitted with bump stocks as illegal "machineguns."  In 2017, the ATF departed from its long-held view on the legality of bump stocks.  Its new interpretation produced a flood of litigation.  Eventually, a circuit split led the Supreme Court to resolve this question against the ATF.  *See Garland v. Cargill*, 602 U.S. 406, 415 (2024).  The district court in this case nevertheless found the ATF's reading substantially justified and so refused to award attorney's fees to the challengers.  We must give deference to the district court's finding.  And the court acted reasonably because of the substantial judicial disagreement that this novel legal question produced.  We thus affirm.

I

Congress began to regulate machineguns in the National Firearms Act of 1934 and made it a crime to possess these weapons in 1986.  *See* 18 U.S.C. § 922(o)(1); *Gun Owners of Am., Inc. v. Garland* (*Gun Owners I*), 992 F.3d 446, 450–51 (6th Cir. 2021).  Today, Congress defines the word "machinegun" to cover "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  The word also includes "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun[.]"  *Id.*

Section 5845(b)'s definition of "machinegun" codifies the well-known divide between automatic and semiautomatic weapons.  *See Gun Owners of Am., Inc. v. Garland* (*Gun Owners II*), 19 F.4th 890, 911 (6th Cir. 2021) (en banc) (order) (Murphy, J., dissenting).  The definition covers automatic weapons that allow a shooter to "fire multiple times, or even continuously, by engaging the trigger only once."  *Cargill*, 602 U.S. at 410.  But it excludes "semiautomatic"

weapons that allow a shooter to "fire only one time by engaging the trigger" and require the shooter to "release and reengage the trigger to fire" each shot. *Id.* at 411.

This litigation asked where "bump stocks" fit into this divide. Shooters have long engaged in "bump firing" to make a semiautomatic weapon's rate of discharge rival an automatic weapon's rate of discharge. *See id.* A shooter who bump fires first uses the "recoil" energy from a first shot "to push the whole firearm backward." *Id.* The shooter then uses the "nontrigger hand" to place "forward pressure on the rifle's front grip," which pushes the weapon forward "into the shooter's trigger finger" for a second shot. *Id.* The same process repeats itself rapidly. *Id.*

A bump stock helps a shooter bump fire. It replaces a "rifle's stock" "with a plastic casing that allows every other part of the rifle to slide back and forth." *Id.* at 411–12. A shooter thus can more easily control the rapid "back-and-forth motion" required for bump firing. *Id.* at 412. That said, "the trigger still must be released and reengaged to fire each additional shot." *Id.*

The ATF traditionally interpreted the statutory definition of "machinegun" to exclude a semiautomatic rifle with a bump stock because it found that this weapon did not "'automatically' fire more than one shot 'by a single function of the trigger.'" *Id.* Yet the ATF changed its view after the tragic Las Vegas shooting in 2017 that left 58 people dead and hundreds more wounded. *Id.* The murderer had used a bump stock "to fire hundreds of rounds in a matter of minutes." *Id.*

In 2018, the ATF issued a final rule interpreting the machinegun definition to include bump stocks. Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018). The agency gave bump-stock owners 90 days to destroy or relinquish these devices. *See id.* at 66,530. If they refused, the owners could face criminal liability for illegally possessing a machinegun. *See id.* at 66,525.

The final rule prompted many suits. *See Cargill*, 602 U.S. at 415 & n.2. In this case, Gun Owners of America and several others (collectively, "Gun Owners") challenged the rule in a Michigan district court. Contrary to its previous position, the ATF defended the rule on the ground that the machinegun definition unambiguously covered bump stocks. *See Gun Owners I*, 992 F.3d at 454 n.3. It thus disavowed any reliance on the since-overruled "*Chevron*"

framework that required courts to defer to agency interpretations of ambiguous laws.  *See id.* (discussing *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).  Despite the ATF's disavowal, the district court denied Gun Owners' request for a preliminary injunction on the ground that the machinegun definition was ambiguous and that the court must defer to the agency's reading under *Chevron*.  *See id.* at 453.

Two members of this panel disagreed.  We held that *Chevron* deference did not apply to statutes with criminal applications and that the machinegun definition unambiguously excluded bump stocks.  *See id.* at 454–73.  We thus ordered the district court to preliminarily enjoin the rule.  *See id.* at 474.  Judge White dissented.  *Id.* at 475–92 (White, J., dissenting).  Like the district court, she found the definition ambiguous and would have deferred to the ATF's reading.  *Id.* at 475.

Yet this panel decision did not end matters.  Our full court granted rehearing en banc.  *See Gun Owners II*, 19 F.4th at 896.  On the merits, the court split evenly—with eight judges voting to affirm the district court's denial of a preliminary injunction and eight judges voting to reverse that denial.  *See id.*  This split had the effect of affirming by an evenly divided court.  *See id.*

Meanwhile, similar cases progressed throughout the country.  Another panel of our court again found the rule invalid.  *See Hardin v. ATF*, 65 F.4th 895, 897 (6th Cir. 2023).  The en banc Fifth Circuit reached the same result.  *See Cargill v. Garland*, 57 F.4th 447, 450–51 & n.* (5th Cir. 2024) (en banc).  But other circuit courts upheld the rule.  *See Guedes v. ATF* (*Guedes II*), 45 F.4th 306, 312–23 (D.C. Cir. 2022); *Aposhian v. Barr*, 958 F.3d 969, 979–89 (10th Cir. 2020).

This circuit split led the Supreme Court to intervene.  In *Cargill*, the Court determined that the machinegun definition unambiguously excluded bump stocks.  602 U.S. at 415.  The Court reasoned that a rifle with a bump stock "will fire only one shot"—not multiple shots—for each "function of the trigger."  *Id.* at 421.  It also held that the firing of each shot required the shooter's human intervention (the maintenance of "forward pressure on the rifle's front grip"), so the firearm did not shoot more than one shot "automatically."  *Id.* at 424.  Three justices

dissented.  *See id.* at 429 (Sotomayor, J., dissenting).  They would have held that the definition unambiguously covered bump stocks.  *See id.* at 434–46.

The district court stayed Gun Owners' case pending decisions in *Hardin* and *Cargill*. After the Supreme Court issued *Cargill*, the parties disagreed over this case's proper resolution. Gun Owners requested an injunction against the rule; the government argued that Gun Owners should obtain only a declaratory judgment.  The district court agreed with the government and issued a final order declaring the ATF's rule unlawful.

Gun Owners moved for attorney's fees and costs as the prevailing party.  *See Gun Owners of Am., Inc. v. Garland*, 2025 WL 920671, at *1 (W.D. Mich. Jan. 23, 2025).  Although awarding a small amount of costs, the district court denied Gun Owners' request for attorney's fees because the government's position had been substantially justified.  *Id.*  It highlighted the "unsettled" nature of this statutory question and concluded that the government had offered a "reasonable" interpretation of the machinegun definition.  *Id.* at *2–5. Gun Owners appealed.

II

A

Under the longstanding American rule, parties to a lawsuit typically must pay their own attorneys whether they win or lose a case.  *See Lackey v. Stinnie*, 604 U.S. 192, 199 (2025).  But several statutes carve out specific exceptions to this general rule.  *See id.*  For example, in constitutional cases against state officials under 42 U.S.C. § 1983, Congress has given district courts "discretion" to award attorney's fees to the "prevailing party" in the litigation.  42 U.S.C. § 1988(b).  And the Supreme Court has interpreted this statute in a purpose-driven manner as presumptively requiring district courts to grant fees to prevailing plaintiffs and to deny fees to prevailing defendants.  *See Hensley v. Eckerhart*, 461 U.S. 424, 429–30 & n.2 (1983).

This case involves a similar statute: the Equal Access to Justice Act.  When a plaintiff succeeds in a suit against the United States (including its officers or agencies), the Equal Access to Justice Act instructs courts to award attorney's "fees and other expenses" to this "prevailing party" unless the government's position was "substantially justified":

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).  The parties debate only one question about how this text applies here: May the ATF avoid paying Gun Owners' fees because its position was "substantially justified"?

The Supreme Court first addressed the meaning of the phrase "substantially justified" in *Pierce v. Underwood*, 487 U.S. 552 (1988).  Unlike in the § 1983 context, *Pierce* adopted a text-based—not a purpose-based—interpretation of this language.  *See id.* at 564–65.  The Court read the phrase as requiring the government's position to be "'justified in substance or in the main'— that is, justified to a degree that could satisfy a reasonable person."  *Id.* at 565.  By contrast, the government's position need not be "justified to a high degree[.]"  *Id.*  The Court settled on this standard by analogizing to the deferential "substantial evidence" test that governs judicial review of agency action.  *Id.* at 564 (quoting 5 U.S.C. § 706(2)(E)).  To meet the standard, the government must show more than that its position did not warrant "sanctions for frivolousness" under Federal Rule of Civil Procedure 11.  *Id.* at 566.  But the test will be met if a "genuine dispute" existed over the question at issue in the litigation.  *Id.* at 565–66 (citation omitted).

Apart from articulating the controlling standard, *Pierce* also identified several factors to consider when deciding whether the government's position was substantially justified.  Most importantly, courts should look to "the actual merits" of the government's arguments.  *Griffith v. Comm'r of Soc. Sec.*, 987 F.3d 556, 563–64 (6th Cir. 2021) (quoting *United States ex rel. Wall v. Circle C Constr., LLC*, 868 F.3d 466, 471 (6th Cir. 2017)); *see Pierce*, 487 U.S. at 569–70.  When evaluating the validity of those arguments, though, courts must avoid the "hindsight" bias that arises whenever they review the strength of a position that they have already rejected.  *Griffith*, 987 F.3d at 563–64 (citation omitted).  And courts must consider the government's position "as a whole," so they cannot treat the position as unjustified simply because they find

one of several supporting arguments unreasonable. *Amezola-Garcia v. Lynch*, 835 F.3d 553, 555 (6th Cir. 2016) (order) (citation omitted).

Next, courts may look to other "objective indicia" of reasonableness to help ground this inquiry in something other than their instincts. *Pierce*, 487 U.S. at 568. These indicia might include, for example, how other courts have evaluated the position. *Id.* Did the government have a "string of successes" in the lower courts before ultimately losing? *Id.* at 569. Or did it have a "string of losses" before giving up? *Id.* And when a large body of caselaw does not exist on the question, the objective indicia might include the existence of a "dissenting opinion" that accepted the government's position. *Griffith*, 987 F.3d at 563.

B

Although the ATF's position ultimately lost, we see no basis to overturn the district court's conclusion that the agency was "substantially justified" in arguing that the statutory machinegun definition covered bump stocks. 28 U.S.C. § 2412(d)(1)(A). We reach that result for six reasons.

*First*, we must defer to the district court's substantial-justification finding. *Pierce*, 487 U.S. at 563. We may overturn that finding only if the district court abused its discretion when reaching it. *See id.* at 560. And "deference . . . is the hallmark of abuse-of-discretion review." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). In other words, we may not reverse simply because we would have found the ATF's position unjustified if we had considered this question from scratch. Rather, we may reverse only if Gun Owners "firmly convince[s]" us that the district court's contrary conclusion got it wrong. *Griffith*, 987 F.3d at 563 (citation omitted).

*Second*, the district court reasonably held that a "reasonable person" could have thought the ATF's position "correct" on "the actual merits" of the controversy. *Pierce*, 487 U.S. at 566 n.2, 569. This litigation asked whether a rifle with a bump stock "automatically" fires "more than one shot" "by a single function of the trigger." 26 U.S.C. § 5845(b). The answer rested on two interpretive questions.

Question One: Does the phrase "function of the trigger" refer to the "mechanical process" of how the weapon's trigger operates or the "human process" of how the shooter fires the weapon? *Gun Owners I*, 992 F.3d at 469. Granted, six Justices on the Supreme Court (and two members of this panel) held that this question had an unambiguous answer. The Court thus did not need to consider what to do in the face of ambiguity—whether to defer to the government under *Chevron* or to the plaintiffs under the rule of lenity. (The Court's decision in *Cargill* predated its decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)—the case that overruled *Chevron*—by two weeks. In *Cargill*, then, *Chevron* remained controlling.) According to the Court, the phrase "single function of the trigger" refers to the way that the trigger operates—no matter the "type of human input [that] engages the trigger" for each shot. *Cargill*, 602 U.S. at 422; *see Gun Owners I*, 992 F.3d at 470–71. And that interpretation means that bump stocks shoot only one round with "a single function of the trigger" because the trigger must reset and reengage after each round. *See Cargill*, 602 U.S. at 415–22; *Gun Owners I*, 992 F.3d at 469.

But that conclusion does not mean that the ATF *unreasonably* argued otherwise. It instead reasonably argued that rifles with bump stocks can shoot multiple rounds with a "single function of the trigger" because a human shooter can pull the trigger just once to initiate the back-and-forth process that discharges multiple shots. *See Gun Owners I*, 992 F.3d at 469. Indeed, the Supreme Court could explain its contrary conclusion only by using six diagrams and an animation to convey a semiautomatic rifle's components and operations. *Cargill*, 602 U.S. at 417–21 & n.5. And we could explain our contrary conclusion only by relying on the full context because the dictionary definitions alone might support either reading of the phrase "function of the trigger." *See Gun Owners I*, 992 F.3d at 470–71; *see also Cargill*, 57 F.4th at 475–77 (Ho, J., concurring).

Question Two: Does a rifle with a bump stock fire more than one shot *automatically* even though the shooter must "maintain just the right amount of forward pressure on the rifle's front grip" to shoot multiple shots? *Cargill*, 602 U.S. at 424. The answer depends on the amount of human intervention required to find that a gun does not shoot multiple shots "in a manner essentially independent of external influence or control[.]" *Gun Owners II*, 19 F.4th at 912–13

(Murphy, J., dissenting) (quoting *American Heritage Dictionary of the English Language* 90 (1969)).  Again, the Supreme Court (and two members of this panel) held that this question had an unambiguous answer.  The adverb "automatically" requires the gun to fire multiple shots without any human input other than the input required to engage a single function of the trigger. *See Cargill*, 602 U.S. at 424–27; *Gun Owners II*, 19 F.4th at 913, 915 (Murphy, J., dissenting). And a rifle with a bump stock was "indistinguishable" from a pump-action shotgun that a shooter could fire multiple times by pressing on the trigger while repeatedly pumping.  *Cargill*, 602 U.S. at 425–26.  Both weapons required additional human involvement (whether pumping the shotgun or maintaining forward pressure on the rifle) apart from pressing the trigger.  *See id.*

But again, this conclusion does not make the ATF's contrary position *unreasonable*.  To the contrary, the agency had a reasonable analogy of its own.  It compared the forward pressure on the front grip of a rifle with a bump stock to the continuous pressure of "holding down the trigger of a traditional machinegun" to fire multiple shots.  *Id.* at 425.  And all agree that a "traditional machinegun" fits the statutory definition despite this continued human involvement. *See id.* at 427.  That analogy, while mistaken, at least had facial plausibility.

*Third*, the district court also reasonably held that a "reasonable person" could have thought the ATF's position "correct" when one looks at this question from a broader perspective. *Pierce*, 487 U.S. at 566 n.2.  In some respects, this debate centered less on statutory text and more on interpretive philosophy.  Congress banned machinegun ownership because these weapons can fire rapidly and cause great harm in seconds.  *See Cargill*, 602 U.S. at 427; *id.* at 430–31 (Sotomayor, J., dissenting).  And bump stocks allow semiautomatic rifles to achieve similar rates of fire as traditional machineguns.  *See id.* at 427 (majority opinion); *id.* at 432–34 (Sotomayor, J., dissenting).  Despite these similarities between the weapons, the *Cargill* majority refused to exceed "the 'textual limitations upon [the] law's scope'" in the name of fulfilling its general purpose.  *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025) (quoting *Kucana v. Holder*, 558 U.S. 233, 252 (2010)).  As the Supreme Court has often said, "no statute yet known pursues its stated purpose at all costs."  *Id.* (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)).

The dissent, by contrast, was more willing to interpret the text in light of that general "purpose," suggesting that "[w]hen I see a bird that walks like a duck, swims like a duck, and quacks like a duck, I call that bird a duck." *Cargill*, 602 U.S. at 430 (Sotomayor, J., dissenting). This purpose-based approach recalls a time when the Supreme Court was more willing to find that a law covered certain conduct on the ground that the conduct fell within the "spirit" of the law even if it did not fall within the "letter" of the law. *Gun Owners II*, 19 F.4th at 928 (Murphy, J., dissenting) (quoting *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892)); *see* John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 71 (2006); William N. Eskridge, Jr., *The New Textualism*, 37 U.C.L.A. L. Rev. 621, 626–29 (1990).

When deciding whether the government's argument is "substantially justified," did Congress mean to codify one or the other of these interpretive theories? 28 U.S.C. § 2412(d)(1)(A). On the one hand, the text-based approach has gained predominance today. A Supreme Court majority has not "favorably" "cited *Holy Trinity*"—the exemplar case applying a "spirit-of-the-law approach"—"since 1989." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 13 (2012).

On the other hand, Congress passed the Equal Access to Justice Act back in 1980—"the most relevant time for determining [that] statutory term's meaning." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994). It thus enacted the law against the background of a Supreme Court that "unflinchingly applied" *Holy Trinity*'s competing approach. John F. Manning, *Second-Generation Textualism*, 98 Cal. L. Rev. 1287, 1310 (2010); *see, e.g.*, *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 453–55 (1989); *United Steelworkers v. Weber*, 443 U.S. 193, 201–07 (1979). The Court's purpose-based approach to the fee-shifting statute in § 1983 cases proves this point. *See Hensley*, 461 U.S. at 429–30 & n.2. And while citations to *Holy Trinity* are rare nowadays, the approach that it embodies still sometimes makes an appearance at the Court. *See King v. Burwell*, 576 U.S. 473, 497–98 (2015). So we do not think that Congress meant to take sides in this debate. Rather, either theory can render the government's position "substantially justified" in a case. 28 U.S.C. § 2412(d)(1)(A). And while the majority stuck to the textualist approach in *Cargill*, the government did not act unreasonably by proposing the purpose-based reading that the dissent in *Cargill* accepted.

*Fourth*, the district court reasonably held that a "reasonable person" could have thought the ATF's position "correct" because this litigation raised "a novel question." *Pierce*, 487 U.S. at 566 n.2; *Perez v. Jaddou*, 31 F.4th 267, 271 (4th Cir. 2022) (Wilkinson, J.). Courts have given the government more leeway to "litigat[e] cases of first impression" without risking attorney's fees. *Id.* (citation omitted); *see Michel v. Mayorkas*, 68 F.4th 74, 78 (1st Cir. 2023); *Medina Tovar v. Zuchowski*, 41 F.4th 1085, 1091 (9th Cir. 2022); *W.M.V.C. v. Barr*, 926 F.3d 202, 208 (5th Cir. 2019). And here, the parties could look to little (if any) guiding precedent in the courts.

At most, the parties could cite two appellate decisions implicating this statutory question: *Staples v. United States*, 511 U.S. 600 (1994), and *Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009) (per curiam). Yet neither decision foreclosed the ATF's position. Start with *Staples*. That case concerned a different question about the required mens rea to illegally possess a machinegun. *See* 511 U.S. at 602, 604. In a footnote of dicta, the Court informally differentiated automatic and semiautomatic weapons. *See id.* at 602 n.1. It described an automatic weapon as one "that fires repeatedly with a single pull of the trigger" and a semiautomatic weapon as one "that fires only one shot with each pull of the trigger[.]" *Id.* Although we believed that the Court's passing comment favored our reading, we recognized that the language did not "necessarily foreclose" the ATF's attempt to equate "function" of the trigger with "pull" of the trigger. *Gun Owners I*, 992 F.3d at 472 (citing *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives* (*Guedes I*), 920 F.3d 1, 30 (D.C. Cir. 2019) (per curiam)).

And if anything, the Eleventh Circuit's decision in *Akins* supported the ATF's reading. There, the court considered whether an Akins accelerator (which put an internal spring on a bump stock to mechanically push the weapon into the trigger finger after each shot) qualified as a machinegun. 312 F. App'x at 198, 200. Its unpublished decision held that the ATF correctly interpreted "single function of the trigger" to mean "single pull of the trigger" and thus properly read the statute to cover the Akins accelerator. *Id.* at 200. Here, the ATF advocated for the same interpretation of "function of the trigger" that the Eleventh Circuit accepted in *Akins*. *See Gun Owners I*, 992 F.3d at 469. The ATF thus did not "press[] a position 'flatly at odds with the

controlling'" precedent in this case. *Griffith*, 987 F.3d at 564 (citation omitted). To the contrary, it raised a legal argument in an "unsettled" area of law. *Id.* (citation omitted).

*Fifth*, the district court reasonably relied on "objective indicia" showing the reasonableness of the government's position. *Pierce*, 487 U.S. at 569. Most notably, jurists from around the country broadly split over whether bump stocks qualified as machineguns. To start, the Supreme Court fractured 6-3 on this statutory question. *Compare Cargill*, 602 U.S. at 415–27, *with id.* at 434–46 (Sotomayor, J., dissenting). The "dissenting opinion" bolsters the district court's conclusion that the ATF offered a reasonable reading. *Griffith*, 987 F.3d at 563.

Next, judges on our court raised nearly every conceivable theory of what the statute means. Half the court believed that the statutory machinegun definition excluded bump stocks. *See Gun Owners II*, 19 F.4th at 912–15 (Murphy, J., dissenting); *Gun Owners I*, 992 F.3d at 468–73. But several judges found the definition ambiguous and would have deferred to the ATF's reading under *Chevron*. *Gun Owners II*, 19 F.4th at 904–07 (White, J., in support of affirming the district court judgment). And some other judges would have held that the ATF's purpose-based interpretation was the best one anyway. *See id.* at 909–10 (Gibbons, J., in support of affirming the district court judgment). Another panel later took an altogether different path to find the ATF's position invalid. *See Hardin*, 65 F.4th at 898–902. It held that the machinegun definition was ambiguous but rejected the ATF's reading under the rule of lenity. *See id.*

Outside our court, the ATF also had an initial "string of successes." *Pierce*, 487 U.S. at 569. As one example, the D.C. Circuit originally found the ATF's interpretation permissible under *Chevron* at the preliminary-injunction stage before later finding it the best reading after a final judgment. *See Guedes I*, 920 F.3d at 29–32; *Guedes II*, 45 F.4th at 314–19. As another example, the Tenth Circuit likewise found the definition ambiguous and deferred to the ATF's reading under *Chevron* at the preliminary-injunction stage. *See Aposhian*, 958 F.3d at 985. It then stuck with this approach by vacating its decision to consider the case en banc "as improvidently granted." *Aposhian v. Wilkinson*, 989 F.3d 890, 891 (10th Cir. 2021) (en banc) (order). As a third example, a Fifth Circuit panel initially concluded that the ATF's interpretation represented the best reading of the statute before the full court reversed that panel's decision. *See Cargill*, 57 F.4th at 457.

*Sixth*, our later *Hardin* opinion provides one last "objective" indicium of reasonableness. *Griffith*, 987 F.3d at 563 (citation omitted).  There, we described this bump-stock question as "a close one on which reasonable jurists have disagreed" and relied on that disagreement as our basis to invoke the rule of lenity.  *Hardin*, 65 F.4th at 897.  We also later suggested that the definition was "subject to more than one reasonable interpretation[.]"  *Id.* at 898 (citation omitted).  These statements further support the district court's finding that a "reasonable person" could have thought that the ATF "correct[ly]" interpreted the statute.  *Pierce*, 487 U.S. at 566 n.2.

C

Gun Owners' contrary arguments do not convince us otherwise.  It first notes that the ATF had long read the machinegun definition to exclude bump stocks and that it switched only because of "political pressure" after the Las Vegas shooting.  Appellant's Br. 10 (quoting *Cargill*, 602 U.S. at 412).  But Gun Owners fails to explain why this fact matters.  To be sure, if an agency changes its position without addressing "why it sees things differently," a court may find that the agency acted arbitrarily and capriciously.  *Kentucky v. EPA*, 123 F.4th 447, 468 (6th Cir. 2024) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).  Here, though, Gun Owners points to no case that found the rule invalid on this ground.  *Cf. Guedes I*, 920 F.3d at 32–35.  Nor does it identify the governing arbitrary-and-capricious principles.  So we decline to decide this arbitrary-and-capricious question on our own.  After all, the Supreme Court adopted a deferential standard of review for this substantial-justification question to avoid turning proceedings on attorney's fees into "a second major litigation."  *Pierce*, 487 U.S. at 563 (citation omitted).  And while the ATF's prior reading may have provided one datapoint showing that its revised reading was *wrong*, the prior reading did not also show that its revised reading was *unreasonable*.

Gun Owners next reargues the merits of the statutory question, claiming that the ATF's position conflicted with "the plain meaning of an unambiguous statute."  Appellant's Br. 11.  A Supreme Court majority (and two members of this panel) agreed.  *See Cargill*, 602 U.S. at 415–27; *Gun Owners I*, 992 F.3d at 470–71.  But we refuse to hold that the government's interpretation is unreasonable whenever a court concludes that the interpretation conflicts with

the "*best* meaning of the statute" using the traditional tools of interpretation. *Gun Owners I*, 992 F.3d at 470. Such a rule would effectively require fee shifting unless the government adopts the "correct" view of a law in statutory-interpretation cases. *Pierce*, 487 U.S. at 566 n.2. That is especially true now that the Supreme Court has overruled *Chevron* and made clear that statutes always "have a single, best meaning" that courts should apply. *Loper Bright*, 603 U.S. at 400. That said, one should not take this conclusion too far the other way. If the government's reading is so divorced from the statute that no "reasonable person" could have accepted it under any traditional interpretive theory, the reading would not be substantially justified. *Pierce*, 487 U.S. at 565; *cf. Patrick v. Shinseki*, 668 F.3d 1325, 1330–31 (Fed. Cir. 2011); *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 595–98 (D.C. Cir. 1996). The problem for Gun Owners is that the ATF's reading does not rise to that level of "wrongness" for all the reasons that we have explained.

Gun Owners counters that the ATF's reading was unreasonable because the Supreme Court suggested that the agency had "[a]bandon[ed] the text" of the statutory definition. Appellant's Br. 11 (quoting *Cargill*, 602 U.S. at 427). But Gun Owners ignores the context in which the Court made this statement. It rejected the agency's text-based arguments in Parts II.A and II.B of its opinion. *Cargill*, 602 U.S. at 415–27. It then made this statement to transition to the agency's purpose-based argument in Part II.C. *See id.* at 427. In other words, the Supreme Court was not asserting that the agency altogether ignored the text; it was asserting that the agency made purpose arguments *in addition to* textual ones. And the agency's purpose arguments do not render its reading unreasonable. As we have said, its purpose-based approach held sway at the time Congress passed the Equal Access to Justice Act. Besides, even if we assumed that this one argument was unreasonable, its position "as a whole" was not. *Amezola-Garcia*, 835 F.3d at 555 (citation omitted). It is the latter position—not the former—that matters.

Apart from the law, Gun Owners next attacks the ATF's position "on the facts." Appellant's Br. 12. It argues that the ATF wrongly asserted that bump stocks (not shooters) "harness" the firearm's recoil energy because the shooters must push the rifle forward to fire each additional shot. *Id.* at 12–14. But we need not enter this linguistic debate about what "harness" means. For one thing, the parties did not dispute the basic facts about the way that

firearms operate.  As the Supreme Court noted, the ATF "agree[d]" with its explanation of a "semiautomatic rifle's mechanics," so the dispute turned on the *legal effect* of undisputed facts. *Cargill*, 602 U.S. at 421–22.  For another thing, the ATF's position could be substantially justified even if it got details wrong.  As we said, we must consider whether the ATF justified its position "as a whole"—not every sentence in its brief.  *Amezola-Garcia*, 835 F.3d at 555 (citation omitted).  And the ATF reasonably asserted its overarching claim that rifles with bump stocks were machineguns.

Gun Owners lastly challenges the district court's reliance on the mixed landscape in the lower courts before the Supreme Court's *Cargill* decision.  True, the district court mistakenly suggested that the en banc Fifth Circuit (rather than a panel of that court) favored the ATF's position.  *See Gun Owners*, 2025 WL 920671, at *5.  And also true, many judges (including ten judges on this court and a military court) rejected the ATF's reading.  *See Hardin*, 65 F.4th at 897; *Gun Owners II*, 19 F.4th at 895; *id.* at 928 (Murphy, J., dissenting); *United States v. Alkazahg*, 81 M.J. 764, 778–84 (N-M. Ct. Crim. App. 2021).  Yet these points do nothing to eliminate the "objective" marker of reasonableness established by the *other* cases that accepted the ATF's interpretation.  *Pierce*, 487 U.S. at 568.  This debate among "reasonable jurists" instead shows the reasonableness of the agency's reading.  *Hardin*, 65 F.4th at 897.

Gun Owners responds that the courts that accepted the ATF's view decided the cases "on preliminary postures without the benefit of developed records."  Appellant's Br. 22, 29.  But these cases raised a purely legal question about the meaning of the statutory machinegun definition.  So Gun Owners identifies no other facts that might have made a difference after the preliminary-injunction stage.  Confirming this point, the D.C. Circuit upheld the ATF's interpretation after a final judgment—not just at the preliminary-injunction stage.  *See Guedes II*, 45 F.4th at 314–19.

Does it matter, though, that some of these judges upheld the ATF's position based on a ground that it did not argue (that the courts must apply *Chevron* deference to the agency's reading) rather than the ground that it did assert (that its reading was the best one)?  *See, e.g.*, *Aposhian*, 958 F.3d at 985; *Guedes I*, 920 F.3d at 29–32.  Not at all.  Under the now-outdated *Chevron* regime, a court could not uphold an agency interpretation unless it represented a

*reasonable* reading of the statute.  *See Loper Bright*, 603 U.S. at 383, 397.  So the judges who applied *Chevron* deference necessarily found the ATF's reading reasonable—which also would render it substantially justified under the fee-shifting statute.  *See Guedes I*, 920 F.3d at 32.

At day's end, we owe the district court's finding deference.  And given the plausible arguments supporting the ATF's reading as well as the broad circuit debate that its reading engendered, the district court did not abuse its discretion by finding the reading substantially justified.  A contrary holding would "succumb to [the] hindsight[] bias" that we must avoid when considering this attorney's fees question.  *Perez*, 31 F.4th at 274; *see Griffith*, 987 F.3d at 563–64.

We affirm.